(No. 25608.—

The People of the State of Illinois, Defendant in Error, *vs.* Jake Sink *et al.* Plaintiffs in Error.

*Opinion filed October 11, 1940—Rehearing denied Dec. 4, 1940.*

WALTER V. DYSERT, for plaintiffs in error.

JOHN E. CASSIDY, Attorney General, OLIVER D. MANN, State's Attorney, and A. B. DENNIS, (THOMAS C. STIFLER, of counsel,) for the People.

Mr. JUSTICE MURPHY delivered the opinion of the court:

Jake Sink and Thomas Lavinka were jointly indicted in the circuit court of Vermilion county for the murder of Robert Keys. In a trial by jury they were convicted of manslaughter and the court, after overruling motions for a new trial and in arrest of judgment, sentenced them to the penitentiary for indeterminate periods. This writ of error is prosecuted to review that judgment.

The deceased, Robert Keys, of the age of sixteen years, resided with his parents in Attica, Indiana, and was a student in the Attica high school. On the evening of May 19, 1939, after attending a school reception in Attica, Keys and Shelley Nathan, a fellow-student, went by automobile to a tavern known as "Pete's Stables," in Vermilion county,

this State. Other young people of Attica, some of them high school students, were at the tavern when Keys and Nathan arrived and others came later. Upon arrival Keys and Nathan had a drink of whisky. Later they were seated at a table with Arthur Masterson, a fellow-student of Keys, and Masterson's lady friend. While seated at the table Keys drank a bottle of beer. The defendants and Frank Majors and "Red" Roberts were seated at a table close to Keys and his group. Some of those seated at the defendants' table were using vulgar and obscene language. Keys asked they desist in the use of such language and called their attention to the presence of the lady at his table. Sink resented Keys action and replied he had purchased his table, that he would attend to it and Keys could attend to his own business. The defendants and their associates had no previous acquaintance with Keys or his companions. Shortly after this discussion in reference to the obscene language Keys started dancing. Nothing more was said in reference to the incident while the parties were in the tavern. Later the defendants left the tavern accompanied by Majors and Roberts. The exact lapse of time between when the defendants left and Keys followed is not shown. Before Keys left the tavern he stated to Nathan and Masterson, he was "going out to get some air."

Defendants offered no evidence as to what occurred in the tavern. Nathan testified that after Keys left the tavern he and Masterson followed; when they reached the door the defendants and Majors and Roberts were standing a short distance outside; that Majors had Keys by the arm and was urging him to go for a walk, that Keys jerked loose two or three times and said: "I don't want to have anything to do with you bastards;" that Keys did not advance toward the defendants, was standing still with his hands in his pockets and Lavinka hit him on the head with his fist; that he fell, got up unassisted and while he was standing still, doing nothing, Sink ran in and hit him a

blow on the head knocking him down and rendering him unconscious. Masterson testified to the same except he says that when Keys referred to them as bastards Lavinka ran at Keys and said: "You can't call me that," and hit him on the head with his fists. Elmo McLain and Bert Sexton arrived at the tavern about the time the first blow was struck and, as to the part they witnessed, corroborated Nathan and Masterson.

Lavinka testified that they stopped 25 to 30 feet outside the tavern, that Majors "was talking to Keys and had hold of him by his arm and wanted him to take a walk. Bob Keys said: 'No.' Majors asked him two or three times. Bob said: 'No' and pulled away from him and came toward me and said: 'You dirty bastard' and I hit him with my left hand on the jaw." On cross-examination he testified that when he struck, Keys had his fists doubled up, that he came toward him pulling away from Majors, that Keys never raised his hands from his sides but that he, Lavinka, thought he started to. There is no claim that Keys was armed or had any kind of a weapon in his pocket.

Sink testified: "As he [Keys] came out of the place there at 'Pete's Stables' Frank Majors took hold of his arm when he was on the outside and wanted him to go for a walk with him. He turned from Frank Majors, jerked loose and turned to Tom Lavinka and said to Tom Lavinka: 'You are a dirty bastard.' Tom hit him with his left hand and he turned to me and said: 'You are the bastardly son-of-a-bitch.' I throwed up my left hand and hit him on the chin with a punch about that far—eight or ten inches." He further testified that he hit him with his fist. After Sink struck Keys the defendants left the scene of the fight and went to their automobile. Sink then turned and said: "I took enough of your insults in there." Majors and Roberts did not testify. Keys was unconscious after Sink knocked him down and remained so until his death four days later. Keys weighed about 135 pounds. Lavinka

was thirty-nine years old and Sink forty-three. Nathan and Masterson were each seventeen years of age.

Defendants contend a conviction for manslaughter can not be sustained for the reason the indictment charged murder by a joint assault and the proof shows that, in striking Keys, each defendant acted separately and independently of the other; that the actions were separated by a distinct interval of time; that a conviction of manslaughter negatives malice and since there was no malice aforethought there could not be a joint common design to commit the offense of which they were found guilty.

The first two counts of the indictment, in substantially the same language, charged the defendants with feloniously, unlawfully, willfully and with their malice aforethought making an assault upon Robert Keys "and then and there with the hands of both of them * * * in and upon the head of the said Robert Keys feloniously, willfully, unlawfully and with their malice aforethought did then and there strike and beat * * * with the hands of both of them the said Robert Keys" inflicting mortal wounds, etc. The counts charged the defendants with acting jointly and committing a single assault.

The defendants stated their respective blows were received by Keys on the chin and jaw, but the evidence of the attending physician and doctors who performed or were present at the *post-mortem* is that there was an abrasion and discoloration of the skin on the forehead over the left eye and a bruised area at the middle of the left ear. There were only two blows struck and the only reasonable conclusion that can be reached is that the two injuries described by the doctors were caused by the blows which defendants struck.

It is proper to name two or more persons as joint defendants in the same count of an indictment where all acting as principals committed the same offense. Where an offense has been committed by one or more persons acting as principals, and others, by affirmative act advised, encouraged,

aided and abetted its commission, then by force of section 2 of division 2 of the Criminal Code all are liable as principals and may be jointly indicted. (*People* v. *Marx,* 291 Ill. 40.) One who is present at the time an offense is committed and actually participates in its commission, or being present, does some act in the furtherance of the common design, is deemed to be a principal. *People* v. *Richie,* 317 Ill. 551.

It is true an indictment which charges two or more persons with the commission of a joint offense can not be sustained by proof that each committed a separate and distinct offense but that is not the evidence in this case. Defendants were both present and participated in an attack on Keys and as a result of such attack he was knocked down twice. The fact that the blows were separated by an interval of time and the force behind each blow had a separate source is immaterial. The offense charged is the unlawful killing of Keys and under the circumstances shown it can not be said but that both blows contributed to the injuries to the head. If the evidence had shown one defendant struck the blow that caused a particular injury and such injury caused death, that would not avail the other defendant anything for, under the circumstances, he would be deemed to be an accessory and, by virtue of the statute, liable as a principal. In *Coates* v. *People,* 72 Ill. 303, a conviction for the crime of manslaughter was affirmed and it was said that proof that either one of several jointly indicted struck the fatal blow and that the others were accessory at the fact would be sufficient to sustain a conviction of all of them as principals. In *Ritzman* v. *People,* 110 Ill. 362, the accused was one of a party who participated in an assault which resulted in the death of the person assaulted, although it was not shown that Ritzman directly caused the death. It was held that it was not necessary to show that the accused threw the missile which caused the death in order to sustain a conviction for manslaughter as it was shown that

he was present, encouraging the perpetration of the offense, and was thereby equally guilty with the party who struck the fatal blow. In this case neither defendant made any protest or objection to the assault the other made upon Keys but, on the other hand, each participated therein and by their concerted action Keys received injuries, which, according to some of the evidence, was sufficient to cause death. Defendants rely upon cases where the facts are entirely different from the instant case. Such cases as *People* v. *Holtz*, 294 Ill. 143, *People* v. *Matter*, 371 id. 333, and *People* v. *Richie, supra*, are not in point. The objection made by the defendants as to their joint liability is without merit.

Defendants argue that Keys, Nathan and Masterson were under the influence of liquor and when they left the tavern were pursuing the defendants and that the blows struck by the defendants were in self-defense. The evidence as to what occurred outside the tavern has been set forth in detail and from a consideration of all of it we have come to the conclusion that there is no evidence that tends to prove that either of the blows struck by the defendants were made in self-defense. Lavinka, in describing what occurred, says Keys was resisting Majors' solicitation to take a walk and that he stepped toward him (Lavinka) in pulling away from Majors. It does not appear that Lavinka considered he was in apparent danger from Keys or his associates when he hit him. Sink's explanation for hitting him was that Keys called him a name. While there is evidence that Keys, Nathan and Masterson had taken some liquor after arriving at the tavern, there is no evidence to warrant the statement that any of them was intoxicated or that they were following the defendants seeking trouble. The explanation for Keys leaving the tavern was that he was "going out to get some air." All witnesses agree that Majors was urging Keys against his will to go with him for a walk. The only reasonable deduction to be drawn from the evi-

dence is that if Majors and the defendants had not taken hold of Keys he would not have attacked them.

Defendants further contend that the evidence does not show beyond a reasonable doubt that the blows struck by them were the cause of death. There is a conflict in the medical testimony as to the cause of death.

Dr. Melvin L. Hole, a physician and surgeon practicing in Danville for a number of years, testified on behalf of the People that he first saw Keys at 2:00 o'clock on the morning of May 20 at the Lakeview Hospital in Danville. He said Keys was unconscious, carried a temperature of 103°, had an abrasion on his forehead over his left eye, a black and blue mark across the middle of the left ear which was about one and one-half inches in width. Portions of the ear above and below the mark were not bruised. He rendered medical aid and tapped the spine to obtain a specimen of the spinal fluid. The tap produced pure blood in the fluid under pressure which the witness said indicated there was a hemorrhage under the arachnoid coat of the brain caused either by breaking of blood vessels or a probable laceration of the brain tissue itself. He prescribed sucrose intravenously for the purpose of dehydrating the brain and drawing the fluids from it and reducing the pressure. He said the deceased had a cerebral hemorrhage and probable laceration of the brain tissue itself and that in his opinion such condition caused death.

Dr. Jerry J. Kearns, physician and surgeon, had specialized in pathology and had since 1928 been a pathologist with the coroner of Cook county. In that position he had performed many *post-mortems*. He performed a *post-mortem* on the body of Keys in the presence of Drs. Hole, Dietrich and Montfort. He furnished the State's attorney a written report of his findings, which report was admitted in evidence without objection. He also testified, and his testimony and the written report formed the principal basis

for the hypothetical questions propounded to the medical experts who testified for the .People and the defendants. From his evidence and report it appears he found the discoloration of the skin of the forehead on the left side, that there was a black and blue area slightly over an inch in length and little less than an inch in width at the left ear. Upon removal of the scalp he found evidence of bleeding in the forehead, which as to location, corresponded to the site of the bruised area on the surface of the forehead. There were no fractures of the bones in the skull. When the brain was exposed he found blood under the arachnoid covering of the brain in front, back and on one side of the brain. There had been a hemorrhage in the soft tissue of the neck at a point opposite the larynx. The area of such hemorrhage was two inches in one direction by a little over an inch in the other. In the cavity of the left lung he found about a pint of brownish red blood in form of fluid and soft clots. The left lung was collapsed and there were two tears in the covering at the side and back of the chest corresponding to the site of the eighth and ninth ribs. The tears were a little over one-half inch long, one-eighth of an inch wide, one-twelfth of an inch deep and separated by the space of a little less than an inch. The left lung was practically airless. The right lung was distended, contained considerable air and was of a brighter color. All other organs of the body were found to be normal. He gave it as his opinion that the condition of the brain was the result of external violence and that death was caused by traumatic cerebral laceration.

Dr. Harry E. Mock, physician and surgeon, and associate professor of surgery at Northwestern University Medical School, who has specialized in surgery of trauma to head injuries, in answer to a hypothetical question said that, in his opinion, death was caused by severe brain injury. He stated that he based his opinion upon the fact that imme-

diate unconsciousness followed the blows, which would indicate there was brain pressure, the presence of blood in the spinal fluid and the paralyzed condition of the left arm and leg. He stated when there is bleeding in a ventricle in the sub-arachnoid space the spinal fluid becomes tinged with this blood.

Dr. R. M. Montfort, physician and surgeon, who had an extensive practice in Danville since 1915, testifying for defendants said he was present when Dr. Kearns conducted the *post-mortem*. He testified he did not see any lacerations of the brain but did know the condition of the left lung. His description of the conditions found in the lung cavity did not vary materially from those described by Dr. Kearns. In his opinion death was caused by the condition of the lung. He testified on cross-examination that, at the request of defendant Sink, he saw Keys about May 21 and made a report in which he stated: "Pulse regular, good quality; heart systolic, tones clear and occasional indeterminate rales at base of both lungs laterally. No evidence of abdominal conditions such as pain or tenderness in palpation, slight distention perhaps due to opiate; left ear shows echymosis, evidence of echymosis and a slight abrasion on the skin on left frontal region of forehead. An unconscious state due to an apparent pressure on the brain substance by a blood clot from hemorrhage and oedema or mechanical pressure into ventricles, verified, by presence of pure blood found by spinal taps." He stated the conditions found in the *post-mortem* had caused him to change his mind as to the cause of unconsciousness.

Drs. Oscar J. Michael and Edwin F. Dietrich, practicing in Danville for eight and ten years, respectively, in answer to a hypothetical question stated that in their opinion death was caused from the condition of the lung. Dr. J. C. Fisher, physician and surgeon practicing in Danville for a number of years, gave it as his opinion the cause of death was sepsis, from a collapsed lung and imperfect aeration.

Dr. William D. Ryan of Detroit, Michigan, testified he was autopsy surgeon for Wayne county, Michigan, and as such had a wide field of experience in conducting autopsies. In his opinion death was caused by toxemia due to laceration and traumatic injuries of the left lung. He referred to the testimony where certain witnesses quoted Keys as saying he was going out of the tavern to get some fresh air and said such statement indicated that Keys was then suffering from "air hunger" caused by the condition of the lung. The doctors who were present ·at the *post-mortem,* and who testified for the defendant, stated they did not see any lacerations of the brain. The evidence on behalf of the People in rebuttal was that the laceration could not be detected except miscroscopically.

Defendants claim Keys was injured in an automobile accident four days prior to the incident at the tavern and argue that he received injuries at that time which resulted in his death. Such contention has no basis in the evidence. The automobile went into a ditch but did not overturn. There is no evidence that Keys received injury in the accident. For four days following the accident he engaged in his usual school work and those who were in daily contact with him testified that he appeared in his usual physical condition. On the day preceding the trouble at the tavern he assisted other students in moving furniture in preparing for the school reception, assisted in hauling some rock for a rock garden at the school, ate at the school banquet and engaged in the evening activities. This, together with his trip to the tavern and dancing a few minutes before the collapse, refute the theory that he then had a lung impaired to such an extent that it would cause his death four days later.

The only conflict in the evidence bearing upon the cause of death is found in the testimony of the medical experts. It was the jury's province to consider all the circumstances bearing upon the cause of death and, in the light of these,

determine the weight to be accorded to the testimony of the several medical experts. There is sufficient evidence to sustain the verdict and in such a situation this court will not substitute its judgment for that of the jury. *People* v. *Chaney*, 342 Ill. 175; *People* v. *Herbert*, 340 id. 320; *People* v. *O'Grady*, 339 id. 263.

In the third count of the indictment it was alleged defendants made the assault on Keys in some way and manner and by means, instrumentalities and weapons unknown to the grand jurors. Defendants urge they should have been granted a new trial for the reason the evidence discloses the grand jurors had full knowledge of the means used. The first and second counts of the indictment alleged the assault was made with the hands and fists of the defendants and it is sufficient answer to defendants' contention to say that it has long been settled by this court that proof sustaining one good count will sustain a general verdict. *People* v. *Limeberry*, 298 Ill. 355; *Duffin* v. *People*, 107 id. 113; *McElroy* v. *People*, 202 id. 473.

Prior to the beginning of the trial the court ordered the witnesses excluded from the court room during the trial. After Dr. Kearns testified in chief the court permitted him to remain in the room and at times during the trial he consulted with the State's attorney. Objection was made to his presence and consultation with the State's attorney. The objection was overruled. He was recalled in rebuttal. The court was vested with a discretion in this matter and there was no abuse in that regard. *People* v. *Godsey*, 334 Ill. 11; *Bow* v. *People*, 160 id. 438; *Kota* v. *People*, 136 id. 655.

It is urged as a grounds for reversal that the State's attorney propounded questions to the medical experts, the answers to which would invade the province of the jury. Such objection was not made in the trial court and cannot be urged here. Furthermore, counsel for plaintiffs in error

asked questions in the same form. The contention is without merit.

Defendants entered a challenge to the array of grand jurors. The grand jurors were not personally served but were summoned by mail. This contention was answered adversely to the defendants' contention in *People* v. *Wallace,* 303 Ill. 504.

Defendants assign as error the giving and refusal of instructions. People's instruction No. 1 told the jury that the fact that other causes contributed to the death does not relieve a person inflicting an injury on another of responsibility if such injury contributed mediately or immediately to the death. The objection is that it ignores the defense of self-defense. Other instructions are criticized for the same reason. The court gave at the instance of both parties instructions defining the law of self-defense and, while there was no evidence to support the giving of such instructions, under the circumstances proven the giving of them was not prejudicial error. The omission of any reference to self-defense in instruction No. 1 was correct. It is said that People's instruction No. 2 assumed as true certain disputed facts. A similar instruction was held in *People* v. *Harvey,* 286 Ill. 593, to be subject to such criticism. In this case defendant's instruction No. 9 covers the same subject and assumes as true some of the same facts. By the giving of defendant's instruction No. 9 there was no error in the giving of People's instruction No. 2.

Considering all the instructions as a series the jury was fully and properly instructed as to the law applicable to the case. There were some of the instructions that should not have been given but there is nothing in them sufficient to warrant a reversal of judgment. Even though two or more instructions are improperly given, this court has repeatedly held that unless they are of such nature as to have resulted in injury to the defendant, the fact of having given them

494

is not ground for a reversal. *People* v. *Pargone,* 327 Ill. 463; *People* v. *Talbe,* 321 id. 80; *People* v. *McIntosh,* 242 id. 602.

Other errors assigned are that the defendants should have been granted separate trials, that their motion for a continuance should have been granted, that they should have been furnished with a bill of particulars and that the State's attorney in his closing argument made prejudicial remarks. These have all been considered and are held to be without merit.

The judgment of the circuit court was correct and is affirmed.

*Judgment affirmed.*