(No. 34007.—

THE PEOPLE OF THE STATE OF ILLINOIS, Defendant in Error, *vs.* CHARLES TOWNSEND, Plaintiff in Error.

*Opinion filed March 20, 1957.*

SCHAEFER, J., and KLINGBIEL, C.J., dissenting.

GEORGE N. LEIGHTON, of Chicago, for plaintiff in error.

LATHAM CASTLE, Attorney General, of Springfield, and JOHN GUTKNECHT, State's Attorney, of Chicago, (FRED G. LEACH, EDWIN A. STRUGALA, IRWIN D. BLOCH, JOHN T. GALLAGHER, RUDOLPH L. JANEGA, and WILLIAM L. CARLIN, of counsel,) for the People.

Per CURIAM: Charles Townsend, the defendant, was indicted in the criminal court of Cook County for the murder of Jack Boone. He was found guilty of the charge by a jury, which fixed his punishment at death. He prosecuted this writ of error for a review of the record of his conviction. This court, in a *per curiam* opinion heretofore announced, affirmed the conviction.

The defendant's petititon for rehearing has been allowed to reconsider his contentions restated therein that a confession made by a person in custody while under the influence of drugs is *per se* involuntary, and the admission thereof into evidence is a denial of due process of law. Counsel for defendant does not argue that the drugs were injected for the express purpose of inducing the confession, but insists that it is the fact that defendant was under the influence of a drug injection by police authorities that deprives the confession of that element of voluntary admission which allows it to be admissible in evidence against the defendant.

In our original opinion we summarized the facts from the record, as follows:

At approximately 6:00 P.M. on December 18, 1953, Jack Boone, who normally returned from his work at that hour, was found lying in a dark passageway outside his place of residence at 3754 S. Michigan Avenue in the city of Chicago. He was unconscious and the presence of bleeding wounds in his scalp caused neighbors to summon police who removed him to a hospital where he died three days later. An autopsy revealed that death had been caused by a badly fractured skull and accompanying injury to the brain. Because of the severity of the fracture, the presence of two parallel cuts on the scalp, approximately two inches apart, and because certain small neck bones had been fractured, the pathologist performing the autopsy formed an opinion that the fatal injuries had resulted from an external blow of great force struck on the top of the victim's head.

The day following the discovery of Boone's body, a small boy, who lived three fourths of a block distant at 117 E. Thirty-seventh Place, found a wallet on the first floor landing of the apartment building at that address. The boy turned it over to his father who, because of identification found in the wallet, caused it to be delivered to Boone's wife. On the occasion of her appearance before the grand jury on January 5, 1954, the latter turned it over to the police and later identified it at the trial as belonging to her husband.

On December 29, 1953, during the week following Boone's death, the Chicago police arrested a man named Vincent Campbell. Evidence developed at the trial disclosed that Campbell was an acquaintance of defendant but whether the police were then aware of that fact is not shown. Campbell, who admitted while being cross-examined in this cause that he had informed against defendant, was questioned and kept in custody until about 2:00 A.M., January 1, 1954, at which time he accompanied four police officers to the corner of Indiana Avenue and Thirty-fifth

Street. Located nearby was a poolroom wherein defendant later claimed to be employed as a professional pool player. After a short wait defendant appeared on the street, was pointed out by Campbell, and was placed under arrest. Approximately 36 hours later, in the office of the State's Attorney, defendant signed a written confession to Boone's murder which was ultimately admitted in evidence against him at his trial. The record reflects an exhaustive and painstaking inquiry, outside the presence of the jury, into the circumstances surrounding defendant's confession and as to his claim that its use as evidence would deny him substantial justice.

Looking to the evidence adduced at the hearing on the confession, we find there are certain significant and undisputed facts of a general nature which should preface any consideration of the immediate circumstances under which the confession was given. Summarized briefly they are: that defendant was nineteen years old at the time of his arrest; that his intelligence quotient was characterized as below normal; that he had had little if any gainful employment or apparent means of support in the months prior to his arrest; that he was a confirmed narcotics addict who had used drugs almost continuously since he was fifteen years old and who had failed to respond to an enforced rehabilitation treatment; that his drug habit cost him from approximately five to seven dollars a day, and that he had taken heroin in the hours immediately prior to his arrest.

Following defendant's arrest, which was fixed at 2:30 A.M., January 1, he was taken to the police station for the second district and, by his version, was questioned for at least two hours during which he denied knowledge of Boone's death. According to homicide detectives who did the questioning, the period was nearer a half hour. In any event, at approximately 5:00 A.M., defendant was transported to the lockup of another station where he remained

until 8:30 P.M. without being questioned by anyone. At the hour last stated he was returned to the second district station where he was again questioned by the four arresting officers. Within a short time, by the version of one officer, defendant admitted he had struck and robbed a man on December 18, 1953, in the area where Boone's body was found, and this information caused the officers to summon a representative of the State's Attorney's office to the·station. Before the latter arrived, defendant complained of being sick and stated he could answer no further questions until he had seen a doctor. The time, it appears, was approximately 9:00 P.M. A police surgeon was summoned and, thereafter, both the officers present and the assistant State's Attorney, who arrived at 9:30 P.M., refrained from further questioning.

Upon arriving at the station around 9:45 P.M. the surgeon examined the defendant, determined that he was a narcotics addict and diagnosed his illness, which was manifested by stomach pains, chills and nervousness, as being an acute reaction caused by the withdrawal of the effect of narcotic drugs on defendant's body. To relieve and pacify defendant, the surgeon gave him an injection of sodium phenobarbital and hyoscine hydrobromide, described as a normal treatment in such cases. Before departing, the surgeon left with defendant four quarter-grain tablets of oral phenobarbital instructing him to take two tablets at midnight and two the following morning. According to defendant, however, he took three of the tablets almost immediately. Questioning of the defendant was resumed after the departure of the surgeon but it was not until 11:15 P.M. that he was specifically questioned concerning the Boone murder. At that time the assistant State's Attorney obtained a statement from defendant, by means of questions and answers, which was taken down in shorthand by a court reporter called for the purpose. The sweep of the answers to the questions propounded was that

defendant had on December 18, 1953, in a passageway near Michigan Avenue and Thirty-eighth Street, struck a man on the head with a house brick and robbed him of a wallet; that he took $4.80 from the person of his victim, and that he disposed of the wallet by throwing it in the hallway of a building on Thirty-seventh Place. Upon further investigation the police confirmed the discovery of the wallet and its return to Mrs. Boone as previously related.

At 1:30 P.M. the following day, January 2, 1954, defendant was taken from jail to the office of the State's Attorney where he was given a typewritten copy of his statement, consisting of four pages of questions and answers. While defendant followed on his copy, the assistant State's Attorney read the complete statement aloud and, when he had concluded, defendant placed his signature in the margin of each page and at the bottom of the last page. Two days later, on January 4, at the coroner's inquest, defendant again testified, in response to questions put to him, that he had robbed and murdered the deceased.

The basic objection to the admission in evidence of the confession taken from the defendant is set forth by counsel for the defendant in his brief wherein he states that: "The confession in this case was not admissible because the evidence in the record shows that it was involuntarily extracted from the defendant while he was under the influence of drugs administered to him by a doctor employed by the police who had defendant under interrogation."

Defendant does not argue that the drugs were involuntarily administered as in *People* v. *Heirens*, 4 Ill.2d 131. Defendant does not contend that the medical treatment given him was not proper or that required by good medical practice. The doctor was called at the request of the defendant; it is undisputed that defendant was suffering from "withdrawal pains"—pains resulting when an addict does not receive drugs; it likewise appears without challenge that the medication given defendant was normally used to

relieve an acute drug withdrawal case. The fact that defendant had been given a beneficial administration of drugs by a police physician at his own request, for the purpose of easing his pain, is not proof that defendant was placed under the influence of drugs for the purpose of securing a confession.

Nor is the admission by defendant that the purpose of the injection of phenobarbital and hyoscine was to alleviate his suffering proof that he did not have full possession of his mental faculties at the time of the confession. The confession itself bears witness to the fact that at the time he made it defendant was in full command of his senses. His performance in making it was incompatible with a mind devoid of discernment or of a will of its own. The record is void of any evidence suggesting a plan or intention of the authorities to induce a confession from the defendant by either the involuntary or voluntary use of drugs.

It is significant that the defendant does not contend that at the time he reviewed and signed the statement, some fifteen hours after the visit of the police surgeon and approximately fourteen hours after making it, he was then under the influence of drugs or that he did not then voluntarily execute it. It is likewise significant that no corresponding contentions were advanced as to defendant's testimony given at the coroner's inquest, held on January 4.

Defendant relies on *Leyra* v. *Denno,* 347 U.S. 556, 561, 98 L. ed. 948, 952, to support his contention that "the undisputed facts are irreconcilable with defendant's mental freedom to confess to or deny a suspected participation in a crime." The cited case held that a confession obtained after a lengthy period of questioning by a psychiatrist, skilled in hypnosis, from a person in custody who had requested police to provide medical attention for a sinus condition, was not admissible in evidence for the reason that it had been obtained by a generally suggestive interrogation and by coercion and promises of leniency and to

provide medical care. We think that case is distinguishable on the facts from the instant case.

Defendant argues that the written confession in this case was subtly coerced by means of suggestive interrogation propounded by skilled experts to a nineteen-year-old drug addict, while in a state of "acute withdrawal" from drug addiction and under the influence of drugs injected as hereinabove related, and at a time when he was physically, mentally, and emotionally exhausted.

It is settled law that the use in our courts of a defendant's confession not voluntarily given, or obtained by coercion, either physical or mental, is forbidden by the fourteenth amendment to the constitution of the United States. (*Leyra* v. *Denno,* 347 U.S. 556; *People* v. *Heirens,* 4 Ill.2d 131, 122 N.E.2d 231.) In order to declare a denial of due process, we must find that an absence of fundamental fairness fatally infected the trial; and the acts complained of must be of such quality as necessarily prevents a fair trial. *Lisenba* v. *California,* 314 U.S. 219, 236.

As previously noted, the primary claim of the defense is that the injection of phenobarbital and hyoscine rendered defendant incapable of voluntarily confessing, but it is also suggested that other forms of coercion were used. Thus we find it was claimed below that defendant had been cajoled with promises of drugs, threatened, struck and otherwise mistreated by his questioners. These claims are not pursued in this court, perhaps in view of the categorical denials of all officials concerned and the absence of any supporting physical evidence. Contention is now made, however, that defendant's ability to respond intelligently was broken by the method of subjecting him to intensive questioning until such time as he became physically and emotionally exhausted. The record shows defendant was questioned for only a short period immediately following his arrest and then taken to a lockup where he remained approximately 14 hours without being questioned by anyone.

Thereafter, presumably when the arresting officers had again reported for a night's duty, he was returned to the station where his formal arrest had been accomplished and after a lapse of a 30-minute period, a part of which defendant spent in a showup of suspects to a robbery victim, he stated he could not answer questions until he had seen a doctor. He was not questioned further during the hour-and-a-half period he spent waiting for the arrival of the doctor and receiving medical treatment. After the departure of the doctor, defendant was questioned for approximately three fourths of an hour before the subject of the Boone murder was touched upon, and the record is to be construed as showing his confession was given immediately. We cannot agree that this evidence shows such intense or prolonged questioning as to violate the concepts of fundamental fairness inherent in the guarantees of due process. It would appear, rather, the questioning followed only a routine pattern that could normally be expected to follow the arrest of a person on suspicion of murder. The manner and extent of the questioning by which the confession was obtained are not, in this instance, valid objections to its competency. Cf. *People* v. *Fox*, 319 Ill. 606; *People* v. *Goldblatt*, 383 Ill. 176; *People* v. *Vinci*, 295 Ill. 419.

Counsel for defendant also suggests at this time that the confession was inadmissible under the circumstance that it was made in police custody, at a time when defendant was unattended by counsel, friends or relatives. There is ample and persuasive authority, however, which establishes that the factors relied upon are not sufficient to render a confession incompetent. (*People* v. *McFarland*, 386 Ill. 122; *People* v. *Nelson*, 320 Ill. 273.) The duration of the detention and its circumstances distinguish this case from *McNabb* v. *United States*, 318 U.S. 332, 87 L. ed. 819, and *Fikes* v. *Alabama*, 352 U.S. 191, 1 L. ed.2d 246.

Absent any evidence to support the claims of coercion already discussed, there remains for consideration the ques-

tion of whether defendant's physical and mental condition was such as to foreclose his ability to confess or deny with freedom his involvement in the Boone murder. In this regard defendant's lengthy addiction to narcotic drugs and his low intelligence quotient are advanced as bearing upon his competency to make a voluntary statement. The medical evidence is, however, that defendant's use of drugs would not have caused an impairment of his mental processes or rendered him incapable of knowing the purpose and consequences of a confession. Likewise the psychiatric evidence relative to defendant's low intelligence quotient was that he was sane and thus capable of distinguishing between right and wrong. With these factors eliminated, the resolution of whether defendant possessed the requisite mental powers and freedom at the time he confessed must depend upon a determination of whether the injection of phenobarbital and hyoscine given to treat his illness had the effect of then depriving him of his faculties.

When defendant testified during the inquiry into his confession, he maintained that, prior to the injection, he had consistently denied any knowledge of Boone's death. However, within a few minutes after the injection, according to defendant, his vision became blurred, his memory failed him, he could hear people talk but could not understand or recognize them, he answered questions without knowing why, he couldn't hold his head up, and his only sensation was that he wanted to sleep. He professed not to have any recollection of giving a statement to the assistant State's Attorney and, while he recalled going to the latter's office and signing some papers on the day following the injection, he testified his mental confusion continued to a degree that he did not know what he was signing.

To support the defendant's testimony, and to rebut intervening evidence given by the police surgeon, the defense called Charles Proctor who qualified as an expert

pharmocologist and toxicologist with extensive experience as a teacher and a chemist. In answer to a hypothetical question which encompassed all the facts relating to defendant's habits and the circumstances of his confession, this witness expressed the opinion that the injection given would have caused defendant to suffer from drowsiness and apathy on one extreme, to complete disorientation and excitation on the other. When commenting upon the properties of hyoscine the witness stated that further effects, from the manner in which it was employed here, would be an impairment of vision and the loss of memory for occurrences during the period the drug remained active in the body. This period, he estimated, would commence 10 to 15 minutes after injection and would last for a period of five to eight hours. When cross-examined he revealed he had never actually seen the effects of hyoscine on a human and admitted that he was unfamiliar with its use in treating drug addicts.

In almost direct contradiction to Proctor's testimony, the police surgeon, who stated that the medication was given to relieve and pacify the defendant, testified it would not cause a person to go to sleep, would not impair the eyesight, would not cause a loss of memory and would not cause an impairment of mental condition. Nor would such results occur, he stated, even though defendant had actually taken the four phenobarbital pills immediately after the injection. These opinions of the surgeon, it appears, were based on 14 years experience with narcotic addicts, during which he had treated some 3,000 cases of withdrawal reactions in the same manner as he had the defendant. On cross-examination, while admitting that excessive or prolonged use of phenobarbital or hyoscine could cause different results, he remained firm in his opinion that the dosage given defendant would have none of the effects related in the latter's testimony. Corroborating the testimony of the surgeon was that of the officers present,

and the assistant State's Attorney, to the effect that defendant was not sleepy or drowsy after the injection, that he had no apparent difficulty with his eyesight, and that he answered questions put to him clearly and coherently.

On the basis of the evidence set forth, the trial court found the confession was voluntarily made and denied defendant's motion that it be suppressed as evidence. This decision of the court is now assigned as error.

Confessions are competent evidence only when voluntarily made, and the question of their competency is for the trial court, alone, to decide. (*People* v. *Weber*, 401 Ill. 584; *People* v. *Bartz*, 342 Ill. 56.) In determining, as a preliminary question, whether a confession by an accused is admissible, the court need not be convinced beyond a reasonable doubt of its voluntary character. (*People* v. *Gavurnik*, 2 Ill.2d 190; *People* v. *Costello*, 320 Ill. 79.) On review, the decision of the court on the question of whether a confession was voluntary will not be disturbed unless manifestly against the weight of evidence or unless the court has clearly committed an abuse of discretion. *People* v. *Lindsay*, 412 Ill. 472; *People* v. *Varela*, 405 Ill. 236.

This court has not heretofore resolved the question of whether a person under the influence of drugs is capable of making a voluntary confession. In 1955 the Supreme Court of the State of New Jersey, in *State* v. *Wise*, 19 N.J. 59, 115 A.2d 62, reviewed the decisions on this issue in the State and Federal courts, and concluded: "Although there appear to be few reported cases involving the admissibility of confessions given while the defendant was under the influence of narcotics, we think it is apparent the same principles apply to this class of cases as have long been applied to confessions made while under the influence of intoxicating liquor. In the latter class of cases, both the state and federal courts are in unanimous agreement that the intoxication of the accused at the time he confesses

affects only the weight of the confession as evidence against himself. So long as the accused is capable of making a narrative of past events or of stating his own participation in the crime, his statements are admissible against him. *State* v. *Grear*, 28 Minn. 426, 10 N.W. 472 (Sup. Ct. 1881); *White* v. *State*, 32 Tex. Cr. 625, 25 S.W. 784 (1894); *Eiffe* v. *State*, 226 Ind. 57, 77 N.E.2d 750 (Ind. Sup. Ct. 1948); *Bell* v. *United States*, 60 App. D.C. 76, 47 F.2d 438, 74 A.L.R. 1098 (D.C. Cir. 1931); *Morton* v. *United States*, 79 U.S. App. D.C. 329, 147 F.2d 28, 31 (D.C. Cir. 1945), *certiorari* denied 324 U.S. 875, 65 S.Ct. 1015, 89 L. ed. 1428 (1945); *Bell* v. *United States*, 60 App. D.C. 76, 47 F.2d 438, 74 A.L.R. 1102; 18 L.R.A. N.S., 789; Underhill, Criminal Evidence (2d ed. 1910), § 136."

When the principles of the cited decisions are applied to the record before us, it is our studied judgment that the trial court was fully warranted in finding the defendant's confession to have been voluntary, and that its admission in evidence in no way transgressed due process of law. Although the medical testimony and the evidence as to defendant's condition at the time he gave his confession are in conflict, the record clearly establishes that defendant was capable and did in fact make a narrative of past events in which he coherently detailed the facts, in answer to questions, concerning his commission of the crime charged. There is not one scintilla of evidence that at the time of the review and signing of the statement, defendant's physical and mental condition was such as to foreclose his ability to deny with freedom his involvement in the Boone murder. Additionally there are several other factors which give greater credence to the position of the prosecution. In resolving the conflict of the evidence as to the amnesic effects of hyoscine combined with phenobarbital, we think it proper to consider that the pharmacologist who testified for the defense was totally unfamiliar

with the use of those drugs in the treatment of narcotic addicts and, in fact, had never had occasion to actually observe their effect on any human being. The opinions of the police surgeon, on the other hand, stemmed from years of practical experience gained by using such medication in the treatment of approximately 3000 narcotic addicts suffering withdrawal reactions similar to that experienced by the defendant. Similarly, we think it significant that while defendant's expert testified the effects of the injection would last from five to eight hours, defendant, by his testimony, represented that he still suffered from amnesia, loss of vision and drowsiness, 16 hours later when he was taken to the State's Attorney's office to sign the statement he had given. Still another circumstance, which militates in particular against the contention that the injection reduced defendant to a state where a confession could be elicited by suggestive questions, is that he told of taking and disposing of the deceased's wallet. In this regard an examination of the entire statement fails to disclose that leading or suggestive questions were employed. Finally, and of persuasive significance, is the fact that defendant, on January 4, three days after the confession was given and two days after it was signed, testified at the coroner's inquest, in terms which coincided with his confession, that he had robbed and murdered the deceased. There is no claim that defendant was then under any coercion, mental or otherwise. When these circumstances are considered, we cannot say that the decision of the court finding the confession to be voluntary was against the manifest weight of evidence or an abuse of discretion.

The next contention of defendant is that even if the confession was admissible, there was not sufficient evidence to sustain the verdict of the jury. No claim is made that the *corpus delicti* was not proved, and it would appear from the argument presented that defendant's complaints are directed to the meagerness of the evidence and to the

veracity of Vincent Campbell. As is true of most murders committed by stealth, there were no eyewitnesses to the crime, thus the evidence of the prosecution was confined largely to the confession and to evidence which corroborated it. Insofar as the confession is concerned, the issue of its voluntary nature and the weight it was to be afforded were submitted to the jury before whom most of the evidence given at the preliminary hearing was repeated. The jury, as did the court before it, resolved the conflicts in such evidence against the defendant. The confession, therefore, properly admitted in evidence, was an admission before the jurors that defendant had committed the crime. Corroborating the confession is the testimony of the boy who found the deceased's wallet in the place revealed by the defendant, and the testimony of the pathologist performing the autopsy who described scalp wounds located in such a manner as to have been inflicted by a blow with a house brick, and a skull fracture that resulted from external violence.

The evidence given by Vincent Campbell was that he had seen defendant walking along the street with a brick in his hand, near Thirty-fifth Street and Prairie Avenue, about 8:30 P.M. on an evening in the middle of December, 1953, and that, about three hours later, defendant had entered a poolroom in the same vicinity carrying a brick in a sack. Although he could not remember the date, he remained unshaken on such facts when cross-examined. Defendant's present objection to such testimony does not go to its relevancy or corroborative value but is directed to a contention that it is unworthy of belief. It is axiomatic that the determination of the credibility of a witness and the weight to be afforded his testimony is a function of the jury. Here it was brought out by cross-examination that Campbell had informed on the defendant to obtain his own release from custody. Additionally, the jurors were able to observe his demeanor on the witness stand

and to form some impression of his truthfulness which was in no manner impeached.

On review in a criminal cause this court will not disturb a verdict of guilt on the basis that the evidence is not sufficient to convict unless the evidence is so palpably contrary to the verdict, or so unreasonable, improbable or unsatisfactory as to justify entertaining a reasonable doubt of a defendant's guilt. (*People* v. *Moretti,* 6 Ill.2d 494; *People* v. *McClain,* 410 Ill. 280.) Here we have in evidence a complete confession to the crime charged and, regardless of the weight to be afforded the testimony of the witness Vincent Campbell, evidence which corroborates the confession and establishes every element of the crime of murder. Looking to the record as a whole, it is our conclusion that the evidence supports the finding of the jury and sustains the judgment of the court.

Defendant's final assignments of error are embodied in a claim that his right to a fair and impartial trial was prejudiced by those who conducted the prosecution. More specifically, it is first urged the prosecutor was erroneously permitted to examine witnesses in such a manner as to bring out that defendant was suspected of other crimes. The first instance complained of occurred when a jailer was permitted to testify, over objection and outside the presence of the jury, that defendant's arrest slip showed he was being held for "Investigation of a murder or murders, murders and robbery, * * *." Since this answer was made outside the presence of the jury it is impossible for it to have influenced the jurors in their verdict. Nor has defendant otherwise demonstrated how it could have infected his trial, other than to imply that it could have influenced the rulings of the court. Apart from the fact we would not impute to the court a breach of its sworn duty on so tenuous a suggestion, the record here is completely unsusceptible to a charge that the court was

biased or prejudiced in any respect. On another occasion, this time in the presence of the jury, one of the arresting officers was extensively cross-examined with reference to the length of time spent in questioning the defendant. During redirect examination which followed, and after the officer had testified that only five minutes of a 20-minute period had been devoted to questions concerning the Boone case, he was asked: "And the rest of the time was consumed with matters other than the Boone matter?" The question went unanswered when an objection by the defense was sustained. Although it is sufficient to point out the action of the court in sustaining the objection removed any damaging effects of the question, we note too that the same witness had just testified on cross-examination that the defendant had, during the same period of interrogation, denied knowledge of or complicity in any crime. In the face of such circumstances, it cannot be said that the jury would interpret the reference to "other matters," as being a reference to "other crimes." Inherent in defendant's argument is a suggestion that the question complained of was deliberately asked in order to inform the jury defendant was suspected of other crimes. The record discloses, however, that the question was propounded on redirect examination solely to meet the challenge of cross-examination which had sought to establish that defendant had been coerced by prolonged questioning into confessing the crime in question. For the reasons set forth we find no merit to the contention now made.

The final circumstance advanced as depriving defendant of a fair and impartial trial is the action of the court in permitting a police officer, who was a material witness, to remain in the courtroom throughout the trial. This contention is without merit. The exclusion of witnesses from a courtroom is a matter resting within the sound discretion of the trial court and its exercise will not be disturbed

unless a clear abuse, or prejudice to the defendant is shown. *People* v. *Sink*, 374 Ill. 480; *People* v. *Winchester*, 352 Ill. 237; *Powell* v. *United States*, 207 F.2d 618.

We have carefully examined the entire record and are convinced not only that defendant was proved guilty beyond a reasonable doubt, but also that he was accorded a fair and impartial trial with full and effective representation. His crime was brutal, callous and unprovoked, and since the requirements of the law have been fully met, it is the duty of this court to confirm the judgment. On the evidence, and in the absence of prejudicial error, the judgment of the criminal court of Cook County is affirmed. It is the further judgment of this court that the original sentence imposed upon the defendant shall be executed on the 7th day of June, 1957, and the clerk of this court is directed to enter an order to that effect, and to furnish a certified copy of such order to the sheriff of Cook County.

*Judgment affirmed.*

Mr. JUSTICE SCHAEFER, dissenting:

In this case the confession was taken under circumstances that, in my opinion, make it inadmissible. And I think that the evidence relied upon by way of corroboration is totally insufficient.

The confession was taken from the defendant when he was, in the words of the police department doctor, "a narcotic addict, suffering from acute withdrawal" and shortly after the doctor had administered phenobarbital and hyoscine to relieve his pain and produce calm and body quiet, "because he needed rest." Admittedly the drug was designed to and did operate on the mind of the defendant. A professor of pharmacology and toxicology in the school of medicine at Loyola University testified that the drugs administered, even in the quantities that the police department doctor said he used, would produce amnesia.

In justifying the admission of the confession, the majority rely on cases involving intoxicated persons. In none of them, however, was the intoxication induced by the police. Here we are dealing with a confession taken while the defendant was under the influence of a drug administered by a police department doctor to a defendant in police custody. In my opinion a conviction based upon a confession taken under these circumstances violates due process of law.

So much for the confession. As to corroboration, there is first the testimony of Vincent Campbell. He was arrested December 29, 1953. While still in police custody, at 2:30 A.M. on January 1, 1954, he was taken by police officers to Thirty-fifth Street and Indiana Avenue where he pointed out the defendant to the officers who then arrested defendant. At the trial Campbell testified that on an unspecified date in December, 1953, he saw the defendant carrying a house brick and that three or four hours later he saw the defendant enter a pool room and lay down a bag containing a brick. As the majority points out, "Campbell informed on the defendant to obtain his own release from custody." If the purpose of his testimony was not to put a brick in the defendant's hand during the time that this crime was committed, it was irrelevant. But for that purpose it was inherently incredible. It requires us to believe that defendant started out to commit an assault with a common house brick and that after committing the crime he carefully wrapped up and preserved the brick.

The majority also relies for corroboration on the circumstance that the deceased's wallet was found by a boy in a hallway on Thirty-seventh Place on December 19, and that the police did not know it had been found until it was produced before the grand jury by the deceased's wife on January 5, 1954. But there is no testimony as to when the police learned of the finding of the wallet. Defendant's

50

confession itself shows that the police knew on January 1 where the wallet had been found. The pertinent questions and answers are:

"Q. What did you do with the wallet?

A. Threw it in the hallway near an alley on 37th Street.

Q. Was it 37th Street or 37th Place?

A. 37th Place."

I think that the judgment should be reversed and the cause remanded for a new trial.

KLINGBIEL, C.J., concurs in the foregoing dissenting opinion.