UNITED STATES of America ex rel.
Charles TOWNSEND, Petitioner-
Appellant,

v.

Frank G. SAIN, sheriff of Cook county,
Illinois, and Jack Johnson, warden of
the Cook county jail, Respondents-Ap-
pellees.

No. 12759.

United States Court of Appeals
Seventh Circuit.

April 7, 1960.

George N. Leighton, Chicago, Ill., for
appellant.

Francis X. Riley, Asst. State's Atty.,
Chicago Ill., Benjamin S. Adamowski,

State's Atty., Cook County, Ill., Chicago, Ill., for appellees.

Before HASTINGS, Chief Judge, SCHNACKENBERG, Circuit Judge, and GRUBB, District Judge.

SCHNACKENBERG, Circuit Judge.

On December 12, 1958, Charles Townsend filed a petition for habeas corpus in the district court, naming Frank G. Sain, sheriff of Cook county, Illinois, and Jack Johnson, warden of Cook county jail, as respondents. Petitioner was at that time awaiting execution in said jail, pursuant to a judgment of the criminal court of said county, convicting him of murder. The conviction had been affirmed by the Illinois Supreme Court, People v. Townsend, 11 Ill.2d 30, 141 N.E.2d 729.

Petitioner prayed for the district court to grant him a full hearing and that orders be entered setting aside his conviction and the judgment and sentence imposed upon him, ordering a new trial, and for general relief.

Pursuant to a rule to show cause, respondents filed an answer to the petition, incorporating the final order of the Supreme Court of Illinois in a post-conviction proceeding instituted by petitioner.

On a hearing, a record of the entire proceedings in the Illinois courts was produced and considered by the district court.[1] No other evidence was offered or received in that court.

From the records of the state court proceedings, which were before the district court, appear the basic undisputed facts now related.

One evening during the middle of December, 1953, Vincent Campbell, who had known petitioner for several years, saw him at 35th street and Prairie avenue, in Chicago. Campbell asked "how he was doing" and petitioner said he was "going to make some money", and Campbell noticed that he was carrying a housebrick. Several hours later, Campbell saw petitioner in a billiard hall near 35th and Prairie, where Campbell was playing a game of billiards. Petitioner came in carrying a bag which he laid on a bench. The bag had a little tear in it and it was folded near where it was ripped. Campbell noticed that it contained a brick.

Jack Boone, 43 year-old steelworker, living with his wife and two sons, left his home at 3754 South Michigan Avenue for work, December 18, 1953. He was found later in the passageway alongside the apartment house in which he lived, with blood on the back of his head behind his right ear. He was taken shortly afterward to a hospital where he died on December 21, 1953. His wallet was discovered on December 19, 1953, in a nearby apartment building.

Except for 8 or 9 days, petitioner had been unemployed in 1953.

### January 1, 1954

About 1:45 a. m. on January 1, 1954, petitioner, 19 years old, was arrested by Chicago police officers, to whom he stated that he was a narcotics addict and that he had given himself heroin 1½ hours earlier. He was taken to the 2d district police station, where at about 2:30 a. m. he was asked his name, address, and such information, by the lockup keeper, who made out an arrest slip. His answers were clear and coherent. He was then questioned in a room in the station for about 30 minutes by police officers Fitzgerald, Cagney and Corcoran, about various crimes, which he denied having committed. He was then placed in the women's cell alone and at about 5 a. m. was removed to the 19th district station. He was not interrogated there. He remained there until that evening, lying or reclining on his bunk.

---

1. This hearing followed a vacation of our judgment in United States ex rel. Townsend v. Sain, 7 Cir., 265 F.2d 660, and remandment to the district court by the Supreme Court of the United States, 359 U.S. 64, 79 S.Ct. 655, 3 L.Ed.2d 634, on the authority of United States ex rel. Jennings v. Ragen, 358 U.S. 276, 79 S. Ct. 321, 3 L.Ed.2d 296.

Petitioner was returned to the 2d district station about 8:30 p. m. and a showup in which petitioner was viewed with others lasted about 10 minutes. During the showup plaintiff and another prisoner engaged in a fist fight. To all of the officers who saw him petitioner seemed clear, distinct and coherent in speech. Shortly before 9 p. m. petitioner was questioned by Cagney about the Boone killing and other matters for about 15 minutes. He stated he struck a man and robbed him, on the west side of Michigan Avenue, north of 38th street, about 6 p. m. on December 18.

While at the 2d district station, petitioner complained of stomach pains and held his abdomen. When he asked for a doctor, Cagney telephoned for one.[1-a] At 9:45 p. m. Dr. Clarence E. Mansfield, a police surgeon, came. He spoke to none of the investigating officers, but was directed by the desk sergeant to petitioner. The doctor examined petitioner, tested his heart and eyes, diagnosed his symptoms as resulting from drug addiction and withdrawal, and injected into his arm a solution with a hypodermic syringe. The injection consisted of 2 cc.'s of a saline solution into which the doctor dropped ⅛ grain of sodium phenobarbital and ⅟₂₃₀ grain of hyoscine hydrobromide. He left four ¼ grain phenobarbital tablets with petitioner to be taken, two around midnight and two in the morning. (Petitioner took two that night and the remainder the next day.) At 11:15 p. m., assistant state's attorney Janega came and questioned petitioner. The questions and his answers were recorded by a shorthand reporter.

### January 2, 1954

Petitioner was not again interviewed until the following day, Saturday, January 2, 1954, between 11 a. m. and 1 p. m., after he had been taken to the states attorney's office. A copy of the transcribed questions and answers was handed to petitioner and Mr. Janega read the original to him. Thereupon, petitioner put his initials "CT" on the first page of the original and he signed each page on the margin, and also at the bottom of the last page. His initials on the first page were put alongside the words "Re: death of Jack Boone". On this occasion petitioner did not appear sleepy or complain in any manner.

After signing his confession, petitioner was returned to the 2d district police station, arriving there about 3 p. m. on January 2, at which time he spoke coherently and made no complaints.

### January 3, 1954

On Sunday evening, January 3, 1954, petitioner asked Cagney to get the doctor again because he was not feeling well. The police surgeon arrived that evening and gave petitioner some phenobarbital tablets to take orally.

### January 4, 1954

Petitioner attended a public inquest conducted by the coroner of Cook county, Illinois on Monday morning, January 4, 1954. He was in custody of police officers. He was advised by the coroner of his right not to testify, but chose to do so, was sworn and again confessed the Boone murder.

In accordance with Illinois practice, the state criminal court, when the case was called for trial, disposed of petitioner's motion to suppress his confession on the ground that it was involuntary. Dr. Mansfield and Dr. Harry R. Hoffman, licensed physicians, and 17 lay witnesses testified for the state, and Dr. Charles D. Proctor, who held a degree as a doctor of pharmacology, but was not a licensed physician, testified for petitioner.

Dr. Mansfield testified that he had examined about 20,000 narcotics addicts, about 70% of these being addicted to heroin; that he had treated about 6,000

---

1-a. While the petition for habeas corpus recited that petitioner vomited and threw up blood in the presence of police officers, there is evidence in the record to the contrary, given by several police officers and janitors.

or 7,000 who were suffering from a withdrawal of narcotics and in about 50% of that number had used the same injection and treatment he administered to petitioner. He found from his experience that phenobarbital reacts very well combined with hyoscine to quiet a person, to pacify, because it delays at once emotional trends that cause one to be hilarious and excitable. The addict in withdrawal is suffering from a nervous reaction. The hyoscine is to relax and the phenobarbital to seditize. Dr. Mansfield testified: "I wanted him to rest. I did not want him to go to sleep".

He also testified that he could recall no case in his experience where his use of hyoscine produced loss of memory.

When asked on cross-examination whether he had given petitioner "any *truth serum* or anything you considered that?", he answered "*No. I never saw any in my life*". (Emphasis supplied.)

Dr. Proctor testified that he had never prescribed treatment for drug addicts and had never observed the effect of hyoscine on human beings, his knowledge being gained by reading textbooks. He considered a ⅛ grain of phenobarbital given hypodermically a very low sedative dose. Hyoscine, in his opinion, exaggerates a narcotic's restlessness, prostration and excitation and deorientation would be increased, affecting consciousness and memory within a wide range. Within that range it produces amnesia and memory loss as to details and events occurring during the period of the effects of the hyoscine, which is 5 to 8 hours. The duration of amnesia would be the same for an addict as for a normal person however. In answer to a hypothetical question, he gave as his opinion, *inter alia*, that the assumed person suffered amnesia and had only partial consciousness.

The court overruled the motion to suppress the confession as evidence.

At the subsequent jury trial the confession was introduced into evidence, in these circumstances:

Petitioner, as a witness in his own behalf, denied that he robbed or assaulted Boone. He also testified that he remembered Mr. Janega coming to see him. He also remembered being in the states attorney's office and being handed some papers which he held in his hand while the state's attorney read to him.

Lewis Matsuoka, a court reporter, testified at the trial that he took shorthand notes of the interview of Janega with petitioner and reduced the same to typewritten form. That document as received in evidence at the trial, reads as follows:

"Statement of Charles Townsend taken at the 2nd District Police Station, 300 East 29th Street, Chicago, Cook County, Illinois, on Friday, January 1, 1954, at 11:15 O'clock p. m.

"Present:

"Mr. Rudolph L. Janega, Assistant State's Attorney

"Officer Edward Cagney, Homicide Section, D. B.

"Officer John Fitzgerald, 2nd District

"Reported by L. Matsuoka, Book No. 54–01.

"Mr. Janega:

"Q. What is your name? A. Charles Townsend.

"Q. Where do you live, Charles? A. 3641 Giles.

"Q. Where are you staying? A. 243 East 35th Street.

"Q. With whom do you live there? A. With Harold Hares.

"Q. Everything you are going to tell me about this case you are going to tell me of your own free will, is that right? A. Yes, sir.

"Q. There has been no threats made to you or no promises made to you, is that right? A. No, sir, no promises or no threats.

"Q. Calling your attention to December 18, 1953, can you recall where you were at about 6:00 p. m.? A. Yes, sir.

"Q. Where were you? A. 38th and Michigan.

"Q. What is located there? A. A big building and passageway.

"Q. A big building with a passageway that leads where? A. Back in the back to another building.

"Q. To another building? A. Yes, sir.

"Q. What, if anything, unusual occurred there? A. Sir?

"Q. What, if anything, unusual occurred there? What happened there? A. A man was going through the passageway.

"Q. How was he built? A. A young fellow, weighed maybe 135 pounds.

"Q. How was he dressed, do you know? A. No, sir.

"Q. What happened to that man? What did you do to him, if anything? A. Hit him in the head with a house brick and taken his money.

"Q. How many times did you strike him? A. Once.

"Q. What part of him did you strike? A. His head, the back of his head.

"Q. What happened after you struck him? A. He fell down.

"Q. That was in the passageway? A. Yes, sir.

"Q. What did you do after the body fell? A. Went in his pocket and taken his money.

"Q. What else did you take? A. His wallet.

"Q. His wallet? A. Yes.

"Q. And what else? A. That was all.

"Q. How much money did you take from this person? A. $4.80, I believe.

"Q. What did you do with the wallet? A. Threw it in the hallway near an alley on 37th Street.

"Q. Was it 37th Street or 37th Place? A. 37th Place.

"Q. You took nothing else. Did he have a wrist watch on? A. No, sir.

"Q. Where did you find the money? A. In his front pocket, left front pocket.

"Q. How? A. In his left front pocket.

"Q. Did he have any money in the wallet? A. No, sir.

"Q. Is that the last time you saw the body? A. Yes, sir.

"Mr. Janega: That's all."

Dr. Hoffman, a licensed physician in Illinois since 1910, and a specialist in nervous and mental diseases, testified for the state at the trial on rebuttal that he had treated hundreds of narcotics addicts and had used hyoscine many hundreds of times and phenobarbital many thousands of times. He had never observed where hyoscine in normal dosage caused amnesia. In answer to a hypothetical question, based upon specific dosages to an assumed person (*i. e.* petitioner in this case), he stated in his opinion that the injection in question could not have caused amnesia or put the subject to sleep.

Both in the review of petitioner's conviction by writ of error, 11 Ill.2d 30, 141 N.E.2d 729, and in its order entered in the post-conviction proceeding, the Illinois Supreme Court considered and rejected the constitutional attacks now made by petitioner.[2] He has ex-

---

2. In its unpublished order in the latter proceeding, the court said, *inter alia:*
"A study of our opinion on the writ of error discloses that all of the evidence with respect to the injection of hyoscine and phenobarbital was carefully considered by us in resolving the issue of the validity of petitioner's confession. (Peo-

ple v. Townsend, 11 Ill.2d 30, 35, 44 [141 N.E.2d 729]). Thus, it is clear that the issue of the effect of the drug on the confession was before us on the writ of error. The only matter which was not presented then was the fact that hyoscine and scopolamine are identical. In an attempt to escape from the doctrine

hausted in the state courts remedies afforded to him by Illinois.

As stated in petitioner's brief, his basic contentions here are that "after he was put under influence of a police injected narcotic drug * * * to pacify and quiet him; and while he was thus under its influence, he was questioned and the confession extracted", and that it is the admission of the confession "that gives rise to federal constitutional questions".

■ In developing his thesis in this court, petitioner goes far beyond what appears in the records of the state courts in his case as to the effects of the injection of hyoscine and phenobarbital to relieve one who is suffering from the results of narcotics withdrawal.[3] Dr. Proctor, his only witness in the criminal court, did not testify to the broad results of hyoscine and phenobarbital injection that the petition for habeas corpus asserts. Dr. Proctor's essential claim (which, we must not overlook, was disputed by Doctors Mansfield and Hoffman), was that "severe amnesia and memory loss" could result. In his brief here, petitioner charges Dr. Mansfield with knowledge that these medicines induce admissions of guilt, and "remove the subject * * * from the scope of reality." There is no evidence to support this charge.

■ Even if we were to attach to Dr. Proctor's testimony the same weight

as that given to that of Dr. Mansfield,[4] we would be faced with a dispute in the evidence as to whether petitioner suffered a loss of memory when questioned by Mr. Janega. On habeas corpus, the district court's inquiry is limited to a study of the *undisputed* portions of the record. Thomas v. State of Arizona, 356 U.S. 390, 402, 78 S.Ct. 885, 892, 2 L.Ed.2d 863, where the court said:

"* * * '[T]here has been complete agreement that any conflict in testimony as to what actually led to a contested confession is not this Court's concern. Such conflict comes here authoritatively resolved [against petitioner] by the State's adjudication.' Watts v. Indiana, 338 U.S. 49, 51–52 [69 S.Ct. 1347, 93 L.Ed. 1801] (1949). Time and again we have refused to consider disputed facts when determining the issue of coercion. See Gallegos v. Nebraska, 342 U.S. 55, 60–61 [72 S.Ct. 141, 96 L.Ed. 86] (1951); Haley v. Ohio, 332 U.S. 596, 597–598 [68 S.Ct. 302, 92 L.Ed. 224] (1948); Ward v. Texas, 316 U.S. 547, [62 S.Ct. 1139, 86 L.Ed. 1663] (1942). The rationale behind such exclusion, of course, lies in the superior opportunity of trial court and jury to observe the witnesses and weigh the fleeting intangibles which may indicate truth or falsehood. We abide by the wisdom of that reasoning."

of *res judicata*, the present petition for a writ of error contends that this fact could not have been presented to us because it was unknown to petitioner and his counsel at the time. Assuming for the moment the truth of this statement, we are of the opinion that the mere fact that the drug which was administered to petitioner is known by two different names presents no constitutional issue. At the original trial there was extensive medical testimony as to the properties and effects of hyoscine. If hyoscine and scopolamine are, in fact, identical, the medical testimony as to these properties and effects would be the same, regardless of the name of the drug. In determining the effect of the drug on the validity of petitioner's confession, the vital

issue was its nature and its effect, rather than its name."

3. He professes to be impressed with the fact that the medicine hyoscine is also known as scopolamine. Why this fact is material he has not made clear to the Illinois Supreme Court or to us. His counsel's argument is sprinkled with the repeated use of the words "truth serum". These glib words have no recognized medical meaning, as Dr. Mansfield's testimony shows, and are evidently borrowed by petitioner from the jargon of science fiction.

4. In his brief petitioner admits that Dr. Proctor was not qualified to have his opinion taken in preference to that of Dr. Mansfield.

■■ While it· is the law that a conviction cannot stand if based on a confession obtained by means violating a defendant's federal constitutional rights, Leyra v. Denno, 347 U.S. 556, 74 S.Ct. 716, 98 L.Ed. 948, petitioner has the burden of sustaining his charge that his constitutional rights were violated in procuring his confession. Therefore, inasmuch as he contends that the medicine given him impaired his memory and thus produced an involuntary confession, we may consider evidence of other statements made by him at times when it is not claimed that any circumstances operated to affect his power of memory. In other words, when the question is whether a person's memory is wholly or partially impaired when he makes a statement, it is significant that the content of the statement is the same as that of several other statements made by him when his memory was admittedly unimpaired.

■ In its essential elements this case is unlike those in which convictions failed because of confessions obtained in violation of prisoners' constitutional rights. In this case there is evidence of the following facts:

(1) Petitioner asked for treatment by a doctor to relieve a condition induced by his narcotics habit;

(2) A physician administered the recognized treatment called for by his condition, without talking to the police officers;

(3) Said treatment, the injection of hyoscine and phenobarbital, relaxed petitioner but did not affect his memory, and

(4) A state's attorney, who did not know of the administration of the treatment, by questioning petitioner, secured his statement as to his assault on Boone.

The statement given was not the result of mistreatment or coercion of any kind. It was made while petitioner was in a state of relaxation induced by proper medication at his own request. In that condition he was able to remember. That he could remember, and moreover that he did remember, are confirmed by the fact that on two subsequent occasions, *viz.*, on January 2, at the states attorney's office, when he signed the transcript of this confession, and on January 4, at the public inquest, when he admitted the assault on Boone, he reiterated the salient facts included in the confession which he now attacks. He has never contended that on either January 2 or 4 his memory was in any way impaired.[5]

Our appraisal of this record convinces us that the police and the prosecuting attorneys carefully acted in accordance with the principles governing the federal constitutional rights of petitioner and that his confession was not involuntary.

For the reasons herein expressed, the order of the district court is affirmed.

Affirmed.

---

5. That such a contention would be entirely groundless is pointed up by the fact that Dr. Proctor, defense witness, testified that the effects from hyoscine should last from 5 to 8 hours.