UNITED STATES of America ex rel. Charles TOWNSEND, No. 210838, by William R. Ming, Jr., his next friend, Petitioner,

v.

John J. TWOMEY, Warden of Illinois Penitentiary, Joliet-Statesville Branch, Respondent.

No. 67 C 389.

United States District Court,
N. D. Illinois, E. D.

Jan. 27, 1971.

William R. Ming, Jr., Sophia H. Hall and McCoy, Ming & Black, Chicago, Ill., for petitioner.

William J. Scott, Atty. Gen., and James B. Zagel, Morton E. Friedman and Donald J. Veverka, Asst. Atty. Gen., Chicago, Ill., for respondent.

## MEMORANDUM OPINION

PERRY, District Judge.

The case of Charles Townsend is said to be the oldest capital punishment case in the country.

The history of the so-called Townsend case dates from the time of Charles Townsend's arrest in the early morning hours of New Year's Day 1954 and covers a span of 17 years. Petitioner (hereinafter sometimes referred to as "Townsend" or "petitioner") was indicted for the murder of Jack Boone on January 6, 1954. He was tried in the Criminal Court of Cook County, Illinois; found guilty by a jury on February 18, 1955, and sentenced to death on April 7, 1955. Thus Charles Townsend has been, since the date of his arrest, confined continuously for 17 years in a jail or state penitentiary and on death row for fifteen years and nine months.

The record in this case is not only long but involved. After the trial there followed numerous reviews, petitions, proceedings, appeals and decisions. The Townsend case is now again before this Court.

This time the cause comes on to be heard upon the Amended Petition for Writ of Habeas Corpus of petitioner, the Answer and Amended Answer thereto of respondents, a traverse by petitioner, evidence submitted in the form of the Appendix in case No. 14519 in the United States Court of Appeals for the Seventh Circuit, the exhibits presented, the testimony of witnesses and the argument of counsel for the parties.

Petitioner alleges violation of his Federal Constitutional rights secured and guaranteed to him by the Fifth, Eighth and Fourteenth Amendments to the Constitution of the United States, and pursuant to the pertinent parts of Title 28, Sections 2241 through 2254, and particularly those of Section 2244(a), this Court has conducted a hearing on petitioner's Amended Petition.

With its long and involved history, the Townsend case stands as an illustration of the myriad complications, the multitude of problems, facing the courts in the area of post conviction review, both direct and collateral in nature. This is one of those cases which place the courts figuratively on the horns of a dilemma—in justice to provide petitioner with the opportunity to pursue every appropriate remedy but at the same time to serve the interest of society by expeditiously disposing of the ever increasing load of such cases.

In addition the Supreme Court of this land has set certain guidelines by its decisions in this area which the lower courts must follow and interpret and apply. These guidelines have been necessarily changed from time to time, especially for procedure in State court trials, in order to bring about uniformity and fairness of trials in State courts and Federal courts. The Supreme Court has been especially zealous and rightly so, in setting guidelines for admitting confessions in capital cases.

The United States Supreme Court in one of its opinions in the case involving an earlier petition by Townsend noted that the case came to it "after a tangle of prior proceedings". Since that time there have been more and involved proceedings in the United States District Court, the Court of Appeals and the Supreme Court and the "tangle" has become a labyrinth which, hopefully, will end with this hearing.

Following is a short history to date of appellate and collateral review of petitioner's conviction as reflected by the pleadings, exhibits and reported judicial decisions:

*Chronology in Townsend Case*

April 7, 1955—Charles Townsend was found guilty of murder and sentenced to death in the Criminal Court of Cook County, Chicago, Illinois.

March 20, 1957—The Supreme Court of Illinois affirmed that conviction. People v. Townsend, 11 Ill.2d 30, 131 N. E.2d 729.

October 14, 1957—Petition for Certiorari denied. Townsend v. Illinois, 355 U.S. 850, 78 S.Ct. 76, 2 L.Ed.2d 60.

November 25, 1957—Rehearing denied. Townsend v. Illinois, 355 U.S. 886, 78 S.Ct. 152, 2 L.Ed.2d 116.

April 28, 1958—Petition for Post Conviction relief denied, Criminal Court of Cook County, Illinois.

May 23, 1958—Petition for Writ of Error (upon the denial of post-conviction relief) denied by the Supreme Court of Illinois.

November 10, 1958—Petition for Certiorari denied. Townsend v. Illinois, 358 U.S. 887, 79 S.Ct. 128, 3 L.Ed.2d 115.

December 15, 1958—Petition for a Writ of Habeas Corpus denied by the United States District Court, Chicago, Illinois.

December 17, 1958—Appeal from the denial to issue a Writ of Habeas Corpus dismissed by the United States Court of Appeals. United States ex rel. Townsend v. Sain, 7 Cir., 265 F.2d 660.

March 9, 1959—Supreme Court of the United States, on certiorari to review the dismissal of the appeal by the Circuit Court of Appeals, remands cause to the U. S. District Court for a hearing. Townsend v. Sain, 359 U.S. 64, 79 S.Ct. 655, 3 L.Ed.2d 634.

June 24, 1959—U. S. District Court dismisses the Petition for a Writ of Habeas Corpus.

April 7, 1960—United States Court of Appeals affirms the U. S. District Court's dismissal. United States ex rel. Townsend v. Sain, 7 Cir., 276 F.2d 324.

April 3, 1961—Supreme Court of the United States grants certiorari. Townsend v. Sain, 365 U.S. 866, 81 S.Ct. 907, 5 L.Ed.2d 859.

March 18, 1963—Supreme Court of the United States remands the case to the U. S. District Court for a hearing on the Petition for a Writ of Habeas Corpus. Townsend v. Sain, 372 U.S. 293, 83 S.Ct. 745, 9 L.Ed.2d 770.

December 17, 1963—Hearing commences in the U. S. District Court upon the Petition for a Writ of Habeas Corpus before Judge Joseph Sam Perry, to whom the case had been reassigned.

January 13, 1964—U. S. District Court finds Townsend's confession to be voluntary, but issues a writ giving leave to the State of Illinois to retry the petitioner within four months after entry of findings of fact, conclusions of law and judgment order.

July 22, 1964—United States Court of Appeals reverses the decision of the U. S. District Court. United States ex rel. Townsend v. Ogilvie, 7 Cir., 334 F.2d 837.

January 1965—Supreme Court of the United States denies certiorari. Townsend v. Ogilvie, 379 U.S. 984, 85 S.Ct. 683, 13 L.Ed.2d 574.

April 7, 1965—U. S. District Court dismisses writ under mandate of Supreme Court and denies leave to file an Amended Petition.

May 17, 1966—United States Court of Appeals affirms the District Court's dismissal of the writ. United States ex rel. Townsend v. Ogilvie, 7 Cir., 360 F.2d 925.

November 7, 1966—Certiorari denied by Supreme Court of the United States. Townsend v. Ogilvie, Sheriff et al., 385 U.S. 938, 87 S.Ct. 304, 17 L.Ed.2d 218.

March 10, 1967—Townsend given leave to file new Petition for a Writ of Habeas Corpus.

March 13, 1967—Motion of Cook County officials to dismiss petition for habeas corpus filed and denied.

March 19, 1968—Respondent's amended motion to dismiss petition for habeas corpus denied.

March 25, 1968—Respondent's motion for leave to file motion for judgment on the pleadings denied.

July 18, 1969—Petitioner transferred from Cook County Jail to Illinois State Penitentiary.

July 22, 1969—Respondent's motion to dismiss because of petitioner's transfer out of their custody.

September 26, 1969—Townsend given leave to file instanter Amended Petition for Writ of Habeas Corpus.

December 8, 1969—Respondent Warden Pate's motion to dismiss Amended Petition for Writ of Habeas Corpus denied in toto. On Court's own motion, Townsend to be given a psychiatric examination. Respondent's answer to be filed in 20 days.

December 30, 1969—Warden Pate files Petition for Writ of Prohibition and/or Mandamus in U. S. Court of Appeals.

January 26, 1970—Response filed by Townsend in accordance with order of U. S. Court of Appeals.

February 10, 1970—Petition for Writ of Prohibition and/or Mandamus denied by Court of Appeals. No opinion rendered.

May 8, 1970—Respondent filed petition for certiorari.

June 22, 1970—Respondent's petition for certiorari denied by the Supreme Court of the United States.

Upon the Supreme Court's last denial of certiorari, this Court proceeded in the matter of petitioner's Amended Petition. Petitioner's counsel having filed a petition alleging that petitioner "has deteriorated into a state of insanity" as a result of his long confinement under death sentence, and petitioner having denied he is insane, this Court ordered that a psychiatric examination be made of petitioner by Dr. Richard C. Marohn, a competent and qualified psychiatrist. Based upon said psychiatrist's psychiatric evaluation of petitioner, upon petitioner's sane and rational pleadings to this Court, and other evidence, the Court found Charles Townsend sane, capable of conferring with his counsel and competent to stand trial.

Petitioner has been ably represented in this proceeding by William R. Ming,

Jr. and Sophia H. Hall and the law firm of McCoy, Ming and Black, as has respondent by William J. Scott, Attorney General for the State of Illinois, and James B. Zagel, Morton E. Friedman and Donald J. Veverka, Assistant Attorney Generals. The Court notes that since about 1957 Charles Townsend has had the benefit of the professional services of the above mentioned law firm and of a former member of that firm, now Mr. Justice George N. Leighton of the Illinois Appellate Court, all of said services having been afforded to the petitioner without any compensation to any of said attorneys. On the trial below petitioner was represented by the Cook County Public Defender and his assistants, all without cost to the petitioner, who is now and has been at all times indigent and without funds to pay for his defense.

This Court has considered the evidence adduced by the parties at this hearing. It again has reread and reconsidered all of the record in this case, as offered in evidence herein, including the various proceedings, appeals and decisions (prior to the Amended Petition herein considered) in the State trial court, the Supreme Court of Illinois, the United States District Court for the Northern District of Illinois, the United States Court of Appeals for the Seventh Circuit and the Supreme Court of the United States.

The Court now is fully advised in the premises herein and has written this Memorandum Opinion which also shall stand as its Findings of Fact and Conclusions of Law herein.

In the hope that this decision will furnish a basis for the final resolution of this case, this Court has conducted a de novo hearing and undertakes to summarize all of the evidence and law applicable in some detail.

In the month of December 1953 there occurred a series of brutal assaults in the neighborhood of 38th Street and Michigan Boulevard in the City of Chicago. Johnny Stinson, Jack Boone, Thomas Johnson, Willis Thompson, Joseph Martin and Gus Anagnost were assaulted and robbed. Stinson, Boone, Johnson and Thompson all died as a result of an assault, each made with some hard substance. According to Martin and Anagnost, a brick was the object with which they were assaulted. The similarity of these six assaults led police to believe that the assailant was one and the same in each case. The armed robbery of Joseph Martin took place on December 4, 1953; the assault on Jack Boone occurred on December 18, 1953, and the last assault, on Gus Anagnost, occurred on December 28, 1953. The police undertook a concerted drive to identify and arrest the person or persons guilty of these assaults.

In the early morning hours of January 1, 1954, a police homicide squad, composed of Police Officers Edward Cagney, John Fitzgerald, George Martin and John Corcoran, arrested several young Negro men on suspicion. Among those arrested were George Hare, Oliver Johnson, Theodore Redd and Vernon Campbell (a/k/a Vincent Campbell). The police accused Vernon Campbell of being implicated in the assaults; but he denied any part. They questioned all the others arrested at length. Campbell and the others informed police that Charles Townsend was a likely suspect, that more than once he had been seen with a brick, and that Townsend had said he was going to use it to "make some money". The police officers inquired as to when and where they might find him.

Vernon Campbell, who was then on probation from a conviction of robbery and was a known associate of Townsend, was put in a squad car and driven around. He knew where Townsend played pool. Campbell named a location near 35th Street and Indiana Avenue. The police and Campbell waited at the corner. At about 2:25 A.M. on New Year's Day 1954 Charles Townsend and Robert Corley or Robert Brown came along and were arrested by the four police officers above named.

Townsend was taken to the Second District Police Station where he was questioned for some time, 30 minutes to an hour or more, with all four of the police officers present, about the death of Jack Boone, a Chicago steelworker, and the several other homicides and robberies. Officer Cagney did most of the questioning. Townsend denied knowledge of Boone's death or of the other homicides and robberies.

Townsend was then 19 years old. The police had learned from Townsend's associates and from him that he was a confirmed heroin addict. They learned from Townsend that it was his practice to take heroin two or three times daily and that he had taken an intravenous injection of heroin around midnight or 12:30 A.M. while the New Year's Eve celebrations were still in progress.

About 5 o'clock in the morning of January 1, 1954, Townsend was transferred from the police station at 300 East 29th Street to the 19th Police District station where he was placed in a cell all alone. The lockup keeper was told to allow no one to speak to Townsend. There Townsend remained incommunicado until about 8 o'clock that evening. He was left without food, except that a lockup officer testified that he was eating a sandwich and asked Townsend if he wanted one and that Townsend answered that he did not.

Shortly after 8 P.M. Townsend was returned to the Second Police District station and to the custody of the officers who had arrested him. There he was put in a "show up" with several other men, including George Hare, Oliver Johnson and Vernon Campbell. The purpose of the "show up" was to allow the aforementioned Gus Anagnost to select from the "show up" the man who had robbed him. Anagnost came in and picked out a Negro male in the line-up other than Townsend as his assailant. There was a scuffle between Townsend and the man identified by Anagnost. The police officers told Anagnost that he "picked out the wrong man."

After the "show up" Townsend was taken into another room and the police officers continued to interrogate him until about 9:45 P.M. when Assistant State's Attorney Rudolph Janega arrived to take a statement from Townsend. He had been called by Officer Cagney who had done most of the questioning of Townsend. When Janega arrived Townsend was holding his stomach and complaining that he was sick and wanted a doctor. Janega would not take a statement from Townsend in his condition and until he was treated by a doctor. He talked with Officer Cagney who said he already had called a police surgeon, Dr. Clarence E. Mansfield, to treat Townsend.

There is a great deal of conflict in the evidence about the circumstances surrounding defendant's confession. The Court first considers the conflicts in the evidence as to what happened before the Assistant State's Attorney was summoned to take a statement and before Dr. Clarence Mansfield was called to tend Townsend. Upon the original trial there was a hearing on Townsend's motion to suppress his confession, a hearing held outside the presence of the jury. At that hearing Officers Cagney, Martin, Fitzgerald and Corcoran were sworn, gave testimony and examined at length. None of them stated that Townsend made any statement about the attack on Jack Boone. They denied that they observed him being sick or complaining of narcotic withdrawal pains, though Officer Cagney gave contradictory testimony. They denied that he was struck, abused or coerced, or promised any consideration in return for a confession. There was a clear inference by them in their testimony that Townsend had at no time prior to the arrival of State's Attorney Janega made any statement admitting his participation in the murder of Jack Boone.

Townsend had been held incommunicado, without food and/or medication, from 2:25 in the early morning. He was an illiterate Negro, 19 years old,

with an I. Q. of 63 to 73. He had been a narcotic addict since the age of 15. He took heroin two or three times daily, and he had taken heroin at about 12:30 A.M. before his arrest.

Townsend had not consulted with any lawyer, nor any one; and he had no opportunity to do so. No mention of his rights, such as to the right to remain silent, or to consult a lawyer, had been made to him. He was denied the right to call his sister. He had no heroin after his arrest and he was suffering severe pain and distress as withdrawal symptoms. The Court concludes that he was by 8:30 o'clock in the evening willing to do anything to get narcotics or a doctor to give him some kind of treatment which would afford him relief. He was wholly at the mercy of his interrogators. They confronted him with statements made by Campbell and others.

Townsend testified at the trial that beginning about 8:30 he was in the custody of the four officers who had arrested him early that morning. He said he was questioned intermittently and that during all the time he was suffering from severe withdrawal symptoms. The testimony of all of the officers confirmed that he was undergoing withdrawal pains and Officer Cagney testified Townsend asked him for "a jolt" of heroin. Townsend said he was repeatedly struck in the stomach by Officer Fitzgerald and that he became sick and vomited. According to Townsend, he was questioned, then put back in his cell, then taken out again and questioned, and that this went on repeatedly. Townsend testified that he continued to deny involvement in Boone's murder and that when he did he was repeatedly struck in the face by both Officers Fitzgerald and Cagney. According to Townsend, Officer Cagney finally began to talk to him about getting a doctor who would give Townsend some morphine, or treat him, and that Cagney would get the doctor if Townsend would cooperate with him by "telling us the truth about this murder."

Townsend testified that after the doctor came and gave him the injection he felt dizzy and sleepy and there was a change in his vision so that he could not see a person's face plainly. He said he had no feelings he remembered other than wanting to go to sleep and that he remembered being taken in and out of his cell and that in the room where he was taken for questioning there were flickering of lights. He testified that at one point he was asleep and was awakened and found himself sitting at a desk and that Officer Cagney handed him a pen and asked him to sign his name. Townsend said he believed he asked the officer if he was going to go out on bond and that the officer said "yes" and that he should wake up and sign his name and that he did.

Dr. Mansfield arrived about 9:45 P.M. He found Townsend was a narcotic addict suffering from acute withdrawal symptoms. Into Townsend's shoulder he injected a combined dosage of 1/8 grain of sodium phenobarbital (hereinafter called "phenobarbital") and 1/230 of a grain of hyoscine hydrobromide (hereinafter referred to as "hyoscine"). Dr. Mansfield was later to testify that this treatment was given Townsend to quiet Townsend down and did not affect any statement that Townsend might have given afterward.

In this Court's opinion, Dr. Clarence Mansfield, the police surgeon who was summoned by police officers on the evening of January 1, 1954, and who gave said injection to Townsend, sometime between 9:35 and 10:10 P.M., well knew the effect the drugs he administered would have on Townsend. He knew the effect of the drug on petitioner's mind was enhanced by co-existing factors such as Townsend being a drug addict, under the stress of being in police custody and of low mental intelligence. He knew the drug could cause hallucinations and disorientation; that it would increase Townsend's suggestibility and lower his resistance to interrogation. But he was

later to withhold this information from Townsend, his attorneys and the trial court. From all of the evidence herein, the Court also is of the opinion that the four police officers who interrogated Townsend were well informed, from their frequent contact with Dr. Mansfield in such cases, about the powers of the drugs administered and knew that Townsend would give the answers he had been told to questions, so long as he was under their control.

Although Dr. Mansfield had advised the police officers to allow Townsend to rest, within minutes questioning was resumed. According to the testimony of all the witnesses, it is an undisputed fact that Janega was not informed that Townsend was a narcotic addict and that he did not know that the police doctor had given Townsend an injection of phenobarbital and hyoscine. Janega testified that Townsend appeared normal after the doctor left. However, the condition of petitioner had changed from one which led Janega not to question Townsend prior to the injection to a condition in which Townsend was willing to answer questions.

Janega took a statement from Townsend, or more accurately, he took six separate statements or confessions of six separate crimes on six separate occasions. Janega, even though a lawyer and an Assistant State's Attorney, did not at any time advise Townsend of his right to have an attorney, or of his right to remain silent and not to answer questions, or of his right to stop answering questions when he chose. He simply started out assuming that Townsend wanted to make a statement, asked him his name and address, and then went straight to the questions about the occurrences. He had come prepared. With him was a court reporter and the confessions were taken uown.

At 10:40 P.M. the Assistant State's Attorney took a confession from Townsend that he had robbed Gus Anagnost. (Gus Anagnost was the man who earlier had picked out of "show up" a Negro male other than petitioner as his assailant.)

At 10:45 P.M. the Assistant State's Attorney took a confession from Townsend that he had murdered a man named Johnny Stinson.

At 11:05 P.M. the Assistant State's Attorney took a confession from Townsend that he had murdered a man named Thomas Johnson. (Thomas Johnson was the man who when he was visited in the hospital by his sister told his sister that his injuries were the result of an accident.)

At 11:15 P.M. the Assistant State's Attorney took a confession from Townsend that he had murdered Jack Boone.

At 11:24 P.M. the Assistant State's Attorney took a confession from petitioner that he had assaulted a man named Joseph Martin.

The Assistant State's Attorney also took a confession from Townsend about the murder of Willis Thompson but this statement was not transcribed, it appearing that Townsend had become in such a condition that he could not answer questions.

Thus, within about an hour, Townsend had confessed to four murders and two armed robberies. Perhaps the time during which he answered questions and recalled details about all of these six alleged crimes was even less. Police Officer Cagney testified the questioning was over about 20 minutes before he left the station at 29th and Prairie at midnight, and at another point stated Townsend was in the detective's room for questioning another 20 or 25 minutes after the taking of the statement regarding Jack Boone.

Townsend's confession in the case of Jack Boone is a pure routine confession, clearly arranged and planned beforehand. It was taken in 10 minutes or less. The other confessions are not before this Court, but the testimony at the coroner's inquest shows that they were of the same character. Questions were put to Townsend and he answered repeti-

tiously as if by rote and as if after rehearsal.

Townsend's confession to the murder of Jack Boone was used at his later prosecution in the Criminal Court of Cook County resulting in a conviction and the imposition of a death sentence, as aforesaid.

On January 2, 1954 Townsend was taken to the office of the State's Attorney of Cook County. There, he signed a typewritten copy of his statement relating to Jack Boone, and the other statements, except for the one concerning Willis Thompson.

The State first prosecuted Townsend on a charge of Stinson's murder, apparently of the opinion that it was the best case against Townsend. Townsend was acquitted in that case.

On January 4, 1954, Townsend was taken to the inquest into the deaths of Stinson, Johnson, Boone and Thompson. On the same day he was delivered to the custody of the Warden of the Cook County Jail. Two weeks later Townsend saw an attorney for the first time. On the day of his arrest, January 1, Townsend asked police officers for an opportunity to call his sister but this opportunity was denied him. At the coroner's inquest the State was represented by the Assistant State's Attorney who had taken the confessions but Townsend had no lawyer to represent him at those proceedings.

From the time of his arrest in the early morning hours of January 1, 1954 and until two weeks after January 4, Townsend was not afforded benefit of counsel.

Townsend was indicted by the Grand Jury of Cook County, Illinois on January 6, 1954 and charged with the murder of Jack Boone in Indictment No. 54–11, People of the State of Illinois v. Townsend. In the trial of Townsend in the Criminal Court of Cook County had in the February Term, 1955, the confession taken by the Assistant State's Attorney from Townsend in the Second Police District on January 1, 1954, was offered in evidence by the People of the State of Illinois.

A motion to suppress the confession was heard by the trial judge outside the presence of the jury. The police doctor testified. No testimony was offered which showed to the trial judge that the drug hyoscine was synonymous with scopolamine and also known colloquially as the "truth serum". No evidence was offered concerning the effect of the drug in combination with the co-existing factors of Townsend's low intelligence, the stress of being in police custody and his drug addiction. On cross-examination during the hearing to suppress the confession, the police doctor was asked whether he had ever said he had given Townsend "any truth serum." The police doctor answered, "No, I did not give him any truth serum or anything. No, nothing I consider that. I never told anybody I did that; I never saw any in my life."

The fact that hyoscine is a drug with the name synonymous with scopolamine and commonly known as "truth serum" and that it has a tendency to cause hallucinations and disorientation and is enhanced by various environmental factors is a common medical, pharmaceutical, pharmacological, toxicological and scientific fact known to doctors generally and to those in the medical profession who use the drug hyoscine. In the proceedings before the trial judge on the motion to suppress evidence, the true identity and pharmacological potential of the drug hyoscine, its synonymous nature with the drug known as scopolamine and its common use as a "truth serum", the hallucinations and disorientation which it may cause, and the environmental factors present which enhance its effect were not brought to the attention of the trial judge who passed upon the admissibility of the confession taken from petitioner on January 1, 1954. Nor was the trial judge advised that one of the other confessions made at the same time was found to be false by the acquittal in the case of Stinson and that still another confession proved questionable by Anagnost's failure to pick Townsend in the "show up", as aforesaid.

The motion to suppress was denied and the confession taken from Townsend on January 1, 1954 that he murdered Jack Boone was admitted by the trial judge and submitted to the jury under Illinois law with the jury allowed to pass upon the voluntary nature of the confession.

At the trial of the cause in the Criminal Court of Cook County, Dr. William H. Haines of the Behavior Clinic of the Criminal Court of Cook County testified that he examined Townsend prior to the trial and found Townsend to possess an I.Q. of 63; and Dr. Haines classified Petitioner as a " * * * near mental defective" " * * * just a little above moron * * * "

The police doctor who had given Petitioner the injection of the drug on January 1, 1954, also testified before the jury when the confession was submitted to the jury for the jury to determine whether the confession was voluntary. In his testimony before the jury the police doctor testified in the same way that he had testified before the trial judge on the motion to suppress the confession. He gave no testimony that would indicate that he knew that hyoscine was synonymous with scopolamine or commonly known as "the truth serum," nor the hallucinatory or disorienting effects of the drug, or the environmental factors which were present in this case which enhanced the effect of the drug. The prosecution called in rebuttal a doctor who also testified about the drug hyoscine. This doctor was asked a question which when answered by him indicated that this particular doctor knew that the drug hyoscine was also known as scopolamine. This doctor did not testify that the drug scopolamine was commonly known as "the truth serum." Further, this doctor was asked whether in his opinion the drug injection given by the police doctor to Townsend on January 1, 1954, was sufficient to cause amnesia. Neither the doctor called in rebuttal by the prosecution, nor the police doctor, nor any other witness, testified before the jury or before the trial judge, or gave any evidence, on the question whether the will of Townsend and his capacity to withstand interrogation had been affected by the drug injected into him by the police doctor at the Second Police District on January 1, 1954, between 9:35 p. m., and 10:10 p. m.

The interrogation of prosecution witnesses, including the two doctors who testified for the State, their cross examination by defense counsel both on motion to suppress and before the jury when the jury determined the voluntary nature of the confession, and the testimony of witnesses for the defendant show that the evidence that was submitted to the court dealt only with questions whether the Petitioner had suffered from amnesia as a result of the drug given to him by the police doctor and whether he was in control of his faculties including his hearing and his sight. In order for the trial judge to have applied the proper constitutional standard to determine the admissibility of the confession under the Fourteenth Amendment to the Constitution of the United States, it was necessary for him to have known the true nature of hyoscine, also known as scopolamine, colloquially called the "truth serum," and the effects of the drug injection in combination with the factors in Petitioner's immediate environment at the time the drug was administered so as to make him unable to resist giving a confession. Nor did the judge know that one of the other confessions made at the same time was found to be false by the acquittal in the case of Stinson and still another confession proved questionable by Anagnost's failure to pick Townsend in the "show up".

From the trial court records it appears that Townsend's court-appointed counsel did not know that hyoscine was synonymous with scopolamine and also known as "truth serum." The identity of hyoscine with scopolamine and its synonymous nature together with its

colloquial name "the truth serum" became known to Petitioner's counsel on appeal after affirmance of Petitioner's conviction in the Supreme Court of Illinois.

After the trial judge ruled on the admissibility of the confession, the confession was submitted to the jury for its determination as to the voluntary nature of the confession pursuant to Illinois law. No evidence was submitted by which the jury was informed that hyoscine was synonymous with scopolamine and also known as "truth serum" and that it can cause hallucinations and disorientation, or about the drug's effect in combination with co-existing factors in Petitioner's environment.

It appears from the State court records that at the trial, Townsend's court-appointed counsel did not know that on January 1, 1954, after the drug injection, Townsend had confessed to three murders and two robberies. The State court records reveal that the court-appointed counsel did not know that prior to the drug injection Townsend had denied any part in six felonies to which he confessed following the drug injection and that the confessions were taken one after another within an hour. (The sixth statement regarding Willis Thompson was not transcribed and signed.)

Neither the trial judge nor the jury knew that the Assistant State's Attorney (who questioned Townsend after the drug injection) did not know the nature of the treatment that had been given to Townsend by the police doctor. The Assistant State's Attorney did not know the identity of hyoscine as scopolamine, also known as "the truth serum," nor did the Assistant State's Attorney know at the time of his questioning of petitioner, or at the time of his testimony at petitioner's trial, that the police doctor had injected into petitioner a drug solution consisting of phenobarbital and hyoscine, also known as scopolamine, colloquially known as "the truth serum."

The trial judge when he overruled the motion to suppress evidence made no findings of fact and reached no conclusions of law from which this court can determine whether in denying the motion to suppress the trial judge was applying the proper constitutional standards in determining the admissibility of the confession under the Fourteenth Amendment to the Constitution of the United States. Hence this Court must reconstruct the evidence taken by the trial court and from further evidentiary hearing find the facts, as it has done herein.

When the cause was submitted to the jury, instructions were given by the trial judge which told the jury how it was to determine whether the confession was voluntary. It appears from the instructions, shown in the record of the State Court proceedings, that the jury was instructed that it could find the confession involuntary if it found that the drug injection caused Townsend "to lose his memory," to suffer "a state of amnesia" and to be unable "to control his answers and to assert his will by denying the crime charged." It appears from these instructions as shown in the State court record that in determining whether the confession was voluntary, the jury was given an impermissible constitutional standard to apply. The proper constitutional standard required instructions which told the jury that in determining the voluntary nature of the confession the jury had to first find that Townsend's will to resist police interrogation had not been overborne or so affected by the drug injected as to have prevented Townsend from being able to resist police interrogation. After receiving these instructions, the jury found that the confession was voluntary; it convicted him, and he was sentenced to death.

The jury selected prior to Townsend's trial was screened to exclude persons who had any scruples against capital punishment or who were opposed to it.

The jury was chosen in accordance with the provisions of Ill.Rev.Stats. 1953, Ch. 38, Section 743:

"On trials for murder it shall be a cause for challenge of any juror who shall, upon being examined, state that he has conscientious scruples against capital punishment or that he is opposed to the same."

Therefore, the prosecution could challenge jurors for cause; it did and the trial court sustained a number of the challenges.

In support of its allegations herein regarding the selection and composition of the jury, petitioner called a new witness, Dr. Hans Zeisel, Professor of Law and Sociology at the University of Chicago Law School and a well known authority on the jury system. Dr. Zeisel has made numerous studies of juries and their attitudes. (References to his studies were made in the footnotes to the Supreme Court's decision in Witherspoon v. Illinois, 391 U.S. 510, 88 S.Ct. 1770, 20 L.Ed.2d 776 (1968).) Dr. Zeisel testified at this hearing:

"That if you exclude systematically from a jury the people who, have scruples against capital punishment, you will increase the propoensity of this jury to vote for the prosecution, on the issue of guilt; because being for or against capital punishment is part of a syndrome which includes, apparently from these data and not only from my study, attitudes toward guilt or innocence of a defendant— where reasonable men may differ about the evidence."

In arriving at these conclusions, Dr. Zeisel relied upon his own extensive study under the auspices of the Law School of the University of Chicago covering interviews with jurors who had been on juries in the Criminal Courts in Kings County, New York, the Brooklyn Criminal Court. This study was done with permission of that court. A similar study of jurors serving on juries in the Criminal Court in Chicago was made, likewise with permission of the court. Dr. Zeisel also considered certain Gallup polls, one of which was also referred to in the *Witherspoon* case, supra. Dr. Zeisel's study was received in evidence.

He testified as to four other similar studies made. Three were made prior to his study, one by Dr. Robert F. Crosson, Department of Psychology, Western Reserve University; another by Professor Faye J. Goldberg of Morehouse College; and a third by Professor W. Cody Wilson of the University of Texas; the fourth study by Edward J. Bronson was recently published in a 1970 issue of the Colorado Law Review. Dr. Zeisel testified his own study and these four studies all supported his conclusion as above set forth.

In reference to the partial record of the voir dire examination in this case Dr. Zeisel testified:

"Inasmuch as my study established that juries from which jurors who have conscientious scruples against capital punishment are excluded, are more likely to vote for the prosecution than juries from which they are not excluded, since this record, which your Honor has now read, shows that such jurors have been challenged for cause in the instant case, all I have to do is to apply a simple solecism and say:

'Since this is one of the type of juries to which my general study applies, I would say the conclusion from my data is inescapable that such a jury was also more likely to vote with the prosecution on the issue of guilt.'"

Dr. Zeisel further testified that on the basis of his studies and investigations he was of the opinion that a jury chosen by excluding persons who have a feeling against imposing the death sentence is not a fair-cross-section of jurors and is not a jury of defendant's peers.

Dr. Zeisel's testimony was in no way impeached or contradicted and the Court concludes the same is true.

Townsend, who is indigent, did not receive a complete transcript of the

proceedings before the State Court since none of the voir dire was included in the record and thus the record was insufficient to enable Townsend to fully avail himself of all judicial remedies necessary to protect his constitutional and legal rights. Such a record was sought by Townsend's counsel for his appeal to the Supreme Court of Illinois. It was never furnished, thereby depriving Townsend of his right to a full and fair record for appeal, and, particularly, he was denied the right of showing to the State Supreme Court and Federal courts how the jury was chosen in the unconstitutional manner as charged by his attorneys.

For the first time in this December 1970 hearing in this court was a partial record of said voir dire examination obtained after tireless effort of Townsend's attorneys. That partial record confirms petitioner's charges that the jury was screened to exclude a number of prospective jurors who had qualms about the death penalty.

Because of its pre-conceived views and opinions the jury which convicted petitioner and imposed the death sentence upon him could not fairly and impartially consider and evaluate the evidence adduced and the instructions given to said jury in rendering a verdict and determining the sentence to be imposed. At the time of petitioner's trial, the judge was bound under Illinois law by the jury's penalty determination. The law has since been changed.

Dr. Clarence E. Mansfield, the police surgeon who administered hyoscine and phenobarbital to Townsend just before his confession, testified upon the original trial as hereinabove set forth. He also testified in one of the hearings before this court in late 1963. His testimony is again before the court as a part of the record in this case. At the time he testified in 1963 this court considered said doctor's testimony credible. Later on, in 1965, said Dr. Mansfield was indicted and tried before this court and this court found him guilty of filing false income tax returns and of perjury. This, coupled with the evidence adduced at this hearing and under all the circumstances, convinces this court that Dr. Mansfield was not and is not a credible witness and that he was not a credible witness in the State court trial nor upon the earlier hearing in this court.

He testified, as aforesaid, that he did not give Townsend any truth serum or anything he considered as such. Dr. Mansfield was employed by the Police Department of the City of Chicago as a police surgeon and testified that in such capacity he had treated hundreds of narcotic addicts with withdrawal symptoms. As a police surgeon he was familiar with narco-interrogation.

There is now before this court new testimony and exhibits relating to the effects of the medication given Charles Townsend prior to his confession. Petitioner called Dr. Lawrence Freedman, who heretofore had not testified in the Townsend case. Dr. Freedman's extensive qualification and background are set forth fully in the transcript of these proceedings. He is a distinguished psychiatrist; a noted expert in the use of drugs and their effects upon the human mind, and the author of numerous publications of accepted scientific authority.

Expert witnesses qualify their statements, rightly so, and counsel for the parties often interrupt the flow of an expert's testimony with objections in order to clarify, as they should. It is then left for the court to summarize applicable and crucial testimony briefly in a memorandum such as this. Dr. Freedman's testimony is included in roughly 250 pages of the transcript of this hearing.

Dr. Freedman examined Townsend before the hearing. He described him as a boy with ruptures in his family life, with a fifth grade education and a history of truancy from school. He placed his present intelligence at below average and said he was retarded. At 15 Townsend had become a narcotic ad-

dict; he had undergone treatment as a narcotic addict, and was upon his arrest at 19 years of age a confirmed narcotic addict. He told Dr. Freedman about his narcotic addiction and about having been through the throes of withdrawal symptoms. The psychiatrist said Townsend told him the withdrawal symptoms lasted from two to three days, started after about eight hours, and that unless the symptoms were interrupted he knew he would suffer them for about two to three days.

Dr. Freedman's testimony was not so much concerned with the fact that hyoscine and scopolamine are identical and known as "the truth serum" as it was with the susceptibility of Townsend to the drug and his suggestibility thereunder. He testified doctors familiar with the drug hyoscine know that it is identical with scopolamine and colloquially known as "truth serum" and that doctors so knew long before 1954. By 1944, according to Dr. Freedman, the common medical literature did not include a recommendation for the combination of hyoscine and barbiturates because by that time the toxic effects of scopolamine including its hallucinatory effects had become so well known that other less complicated sedatives were recommended. He said doctors began substituting sodium amytal for hyoscine in about the 1930s. He testified that scopolamine either alone or in combination with phenobarbital was not the proper medication for a narcotic addict and that the administration of scopolamine was the improper medication for Townsend under all the circumstances.

He testified that phenobarbital would cause "a general relaxation of the musculature * * * depression of the activity * * * of the higher cerebral cortex centers * * * there may be * * * a kind of euphoria, sense of elation, happiness * * * if the dosage is increased the individual is in an excessively tense state, this condition will go on, with regard to barbiturates, to sleep * * * with regard to scopolamine you have a comparable relaxation of the musculature * * * you have a comparable attenuation of the complex ideational relationships in the higher cerebral cortical centers * * * You have, in addition, however, other phenomena, which are distinctive with regard to comparing scopolamine and barbiturates; namely, that you have a psychoplegia of the pupils * * * you have an amnesia for the events which occurred during the period of the effective time of the scopolamine * * * it can reach the point of disorientation and hallucination."

Dr. Freedman further testified that the drug would given one a heightened motivation to cooperate. He agreed with a statement that "one of the advantages of the scopolamine technique is that * * * the subject has no recollection of what transpired during the questioning."

Dr. Freedman has done various studies on the susceptibility and suggestibility of individuals going through the stress of pain and anxiety. He stressed the importance of the co-existing factors at the time scopolamine is given. He included among these the subject's previous background, the stresses, tensions, hopes and fears operating at a given time, the physiological mechanism of action of the drug given, the milieu of the contacts at the time, the stimuli to which a subject is exposed at the time.

Dr. Freedman said that in the hundreds of hours he spent examining prisoners under drugs, he was virtually never able to treat the statements given by them as evidence of objective reality but rather as evidence of subjective personality characteristics.

From his examination of Townsend and the record, Dr. Freedman found Townsend was at the time of his confession given hyoscine under various co-existing factors which made him suggestible. He stated Townsend's statements reflected an inner psychic state.

In his answer to a hypothetical question, Dr. Freedman testified that in order for a person to evaluate the credi-

bility of Townsend's statement, he would have to have available information on all the co-existing factors and their effect in combination with the drug.

As to all his testimony, Dr. Freedman stated that he would have come to the same conclusions in 1954 and would have so testified, if he had been called to testify at the trial in 1955 and at the evidentiary hearing in 1963. His testimony was not contradicted.

This court has read and reread Dr. Freedman's testimony in the light of the importance of the question as to whether petitioner's confession was drug-induced. This court is convinced that a dosage of ½30th of a grain of hyoscine and ⅛th grain of phenobarbital at the time he was suffering from withdrawal symptoms in combination with co-existing factors would have left Townsend's mind in a disorientated condition and irresponsible and that under the co-existing factors his mind would have been overborne.

Dr. Mansfield administered hyoscine to petitioner and to others. He well knew hyoscine, which he gave Townsend, was identical with scopolamine and that the common name for the drug was "the truth serum." He knew about the drug's properties and the effect it would have on Townsend under the co-existing factors of his low intelligence, his drug addiction and the stress of being in police custody. He well knew that the drug has a tendency to cause disorientation and hallucinations and is enhanced by various environmental factors. He well knew that the injection he gave Townsend was not just a sedative, as he testified, to "pacify" him, and that it was not the proper medication under all the circumstances. He knew the drug would make Townsend susceptible to interrogation and to giving an involuntary confession. He did not disclose these very material and relevant facts to the defense, the judge, the jury.

At the trial a doctor of pharmacology and toxicology, not a licensed physician, testified for the defense that an injection such as was given Townsend would cause partial or total "amnesia."

At the trial there was testimony about the identity of hyoscine and scopolamine but the witnesses did not call the drug by its colloquial name, "the truth serum," a term which the jurors would have understood and grasped. The jury was not apprised of the effect upon Townsend of the medication given in combination with factors in Townsend's immediate environment so as to overpower his mind and make him unable to resist giving a confession or to have hallucinations. In judging the credibility of Townsend's confession, the jury should have had this information. It appears that petitioner's counsel did not have full information at the original trial and petitioner thus cannot be barred from raising the matter of the effect of the drug now.

The Supreme Court of Illinois affirmed Townsend's conviction. The People v. Townsend, 11 Ill.2d 30, 141 N.E.2d 729. In its affirmance it applied the test of "coherency" to measure the admissibility of the confession which the trial judge admitted in evidence and which the jury found voluntary.

Mr. Justice Schaefer, one of this country's most eminent jurists, wrote a dissenting opinion, concurred in by the then Chief Justice of that court, Chief Justice Klingbiel.

In the light of the evidence now before this court, this court considers it pertinent to quote that dissenting opinion:

"In this case the confession was taken under circumstances that, in my opinion, make it inadmissible. And I think that the evidence relied upon by way of corroboration is totally insufficient.

"The confession was taken from the defendant when he was, in the words of the police department doctor, 'a narcotic addict, suffering from acute withdrawal' and shortly after the doctor had administered phenobarbital and hyoscine to relieve his pain and produce

calm and body quiet, 'because he needed rest.' Admittedly the drug was designed to and did operate on the mind of the defendant. A professor of pharmacology and toxicology in the School of medicine at Loyola University testified that the drugs administered, even in the quantities that the police department doctor said he used, would produce amnesia.

"In justifying the admission of the confession, the majority rely on cases involving intoxicated persons. In none of them, however, was the intoxication induced by the police. Here we are dealing with a confession taken while the defendant was under the influence of a drug administered by a police department doctor to a defendant in police custody. In my opinion a conviction based upon a confession taken under these circumstances violates due process of law.

"So much for the confession. As to corroboration, there is first the testimony of Vincent Campbell. He was arrested December 29, 1953. While still in police custody, at 2:30 a. m., on January 1, 1954, he was taken by police officers to Thirty-fifth Street and Indiana Avenue where he pointed out the defendant to the officers who then arrested defendant. At the trial Campbell testified that on an unspecified date in December 1953, he saw the defendant carrying a house brick and that three or four hours later he saw the defendant enter a pool room and lay down a bag containing a brick. As the majority points out, "Campbell informed on the defendant to obtain his own release from custody." If the purpose of his testimony was not to put a brick in the defendant's hand during the time that this crime was committed, it was irrelevant. But for that purpose it was inherently incredible. It requires us to believe that defendant started out to commit an assault with a common house brick and that after committing the crime he carefully wrapped up and preserved the brick.

"The majority also relies for corroboration on the circumstance that the deceased's wallet was found by a boy in a hallway on Thirty-seventh Place on December 19, and that the police did not know it had been found until it was produced before the grand jury by the deceased's wife on January 5, 1954. But there is no testimony as to when the police learned of the finding of the wallet. Defendant's confession itself shows that the police knew on January 1 where the wallet had been found. The pertinent questions and answers are:

"Q What did you do with the wallet?

"A. Threw it in the hallway near an alley on 37th Street.

"Q Was it 37th Street or 37th Place?

"A 37th Place."

"I think that the judgment should be reversed and the cause remanded for a new trial."

After the Illinois Supreme Court affirmed Townsend's conviction, there followed the long history heretofore included under the heading Chronology in Townsend case.

The court now turns to its conclusions other than those already intertwined in its findings herein.

■■ The court has jurisdiction of the parties hereto and the subject matter hereof. Upon its filing, the court read and considered the Amended Petition, decided that it had merit and that the ends of justice would be served by a second evidentiary hearing before it. The Court used the discretion given it to entertain such petition. Title 28, U.S.C. Section 2244(a), Brown v. Allen, 344 U.S. 443, 73 S.Ct. 397, 97 L.Ed. 469 (1953); Sanders v. United States, 373 U.S. 1, 83 S.Ct. 1068, 10 L.Ed.2d 148; Townsend v. Sain, 372 U.S. 293, 83 S.Ct. 745, 9 L.Ed.2d 770 (1963); Fay v. Noia, 372 U.S. 391, 83 S.Ct. 822, 9 L.Ed.2d 837 (1963). There is no res judicata in the generally accepted sense applicable in habeas corpus proceedings. Smith

v. Yeager, 393 U.S. 122, 89 S.Ct. 277, 21 L.Ed.2d 246 (1968). Respondent's motions to dismiss were denied; respondent appealed and the Court of Appeals denied respondent's petition for a writ of prohibition and/or mandamus; the Supreme Court thereafter denied certiorari.

New and additional evidence has been adduced at this hearing; new exhibits introduced and new testimony given. Since the earlier evidentiary hearing before this court, there have been advances and changes in the law protecting petitioner's rights.

This hearing has been principally concerned with the question of the effect of the drugs administered on the credibility of Townsend's confession, the importance of the withholding of such evidence crucial to the admissibility of the confession, and the manner of selecting the jury. The court has considered these in the totality of the circumstances and now deals specifically with the allegations made by petitioner in Paragraphs 10(a) through (g) and 11(a) through (g) of his Amended Petition.

(a) Petitioner claims that the infliction of the death penalty on petitioner after his many years of imprisonment under sentence of death "as a result of the State of Illinois' refusal to grant him a hearing on drug-induced confession would be cruel and inhumane punishment in violation of his rights under the Eighth and Fourteenth Amendments to the Constitution of the United States."

■ The State of Illinois denies that petitioner's confinement was the result of a confession obtained by use of drugs and the State has opposed efforts by petitioner to obtain a hearing to which the State claims he was not entitled. The court finds and concludes, however, that petitioner's confinement for more than 17 years, and his remaining under sentence of death for 15 years and 9 months, has not been caused solely by delays in proceedings by the State of Illinois. Rather, the fact that the death sentence has not been carried out and petitioner is still living is due principally to the skillful, persistent and conscientious efforts on petitioner's behalf by his own counsel to save him from the death penalty and secure his release from confinement.

■ Petitioner's counsel also has argued to this court that the infliction of the death penalty after petitioner's many years of imprisonment would be cruel and inhumane punishment. Although this court personally may be of the opinion that the infliction of the death penalty would be cruel and inhumane punishment under the Eighth and Fourteenth Amendments, it cannot so decide since in the case of In Re Kemmler, 136 U.S. 436, 10 S.Ct. 930, 34 L.Ed. 519 (1890) the U. S. Supreme Court held that the imposition of the death penalty by means of electrocution was not cruel and unusual punishment and the courts have consistently sustained the constitutionality of capital punishment. Trop v. Dulles, 356 U.S. 86, 99, 78 S.Ct. 590, 2 L.Ed.2d 630 (1957); Jackson v. Dickson, 9 Cir., 325 F.2d 573, 575. The court is bound by stare decisis. Hence this court is compelled to refuse plaintiff's contention that the death penalty is unconstitutional and violative of petitioner's rights. Only the Supreme Court can finally hold the death penalty unconstitutional, since it is not bound by stare decisis, and to date it has not done so.

The court notes, in passing, that the 17 years Charles Townsend has spent in jail, more than 15 of them under sentence of death, has been in itself additional punishment. There is inescapable despair for those on death row. Dr. Marohn in his psychiatric evaluation of petitioner on September 19, 1970, said Townsend told him of his depression at times because of his imprisonment and that he had passing thoughts of suicide. Dr. Freedman also examined Townsend. He described Townsend as retarded, as one whose personal life had been deeply traumatized by ruptures in the structure of his family and who had at 15 become

a narcotic addict. He testified that Townsend said he had been subject to the agony of doubt for such a long period of time in prison that he would welcome any conclusion to the daily threat of death, including the death penalty itself, in order to overcome the agony which he experienced. He described Townsend as repeatedly caught in false hopes and frustrations.

This court may have a private opinion about the death penalty being cruel and inhumane punishment and its violation of petitioner's constitutional rights, but it, as a trial court, cannot pronounce new law when it is bound to maintain and expound the old.

(That part of this allegation (a) referring to "drug-induced confession" will be hereinafter considered.)

(b) Petitioner alleges deprivation of counsel. Petitioner was not taken before a magistrate or judge, arraigned, or given an opportunity to consult with an attorney for two weeks after his arrest and confession. During the period of his interrogation and the taking of his confession he was not warned of his right to remain silent, he was deprived of the benefit of counsel and his confession was coerced. At the coroner's inquest he was in the custody of police officers. The State was represented by the Assistant State's Attorney who had taken the confessions. Petitioner had no lawyer to represent him at those proceedings. It appears that the coroner did inform him that he need not testify there.

■ The right to a warning to remain silent and deprivation of counsel alone would have vitiated petitioner's confession had it occurred after the decisions in Escobedo v. Illinois, 378 U.S. 478, 84 S.Ct. 1758, 12 L.Ed.2d 977 (1964); Miranda v. Arizona, 384 U.S. 436, 86 S.Ct. 1602, 16 L.Ed.2d 694 (1966) and Gideon v. Wainwright, 372 U.S. 335, 83 S.Ct. 792, 9 L.Ed.2d 799 (1963). However, since Escobedo and Miranda are prospective petitioner's allegation cannot be sustained on them alone. However, it is a fact that despite lack of retroactivity,

the standards of voluntariness in these cases can be and must be taken into consideration by the Court in deciding the voluntariness of Townsend's confession under the totality of all of the circumstances and are herein so considered. Johnson v. New Jersey, 384 U.S. 719, 86 S.Ct. 1772, 16 L.Ed.2d 882 (1966); Davis v. North Carolina, 384 U.S. 737, 86 S.Ct. 1761, 16 L.Ed.2d 895 (1966).

There was substantive law as to petitioner's right to remain silent and to have counsel before Escobedo and Miranda, which cases did not change substantive law regarding self-incrimination but only changed procedural law. After these cases were decided, failure to warn a defendant of said right or allow him an opportunity to have counsel became an absolute bar to the admissibility into evidence of any confession made without such warning and counsel.

■ However, long before in 1932, Powell v. Alabama, 287 U.S. 45, 53 S.Ct. 55, 77 L.Ed. 158, laid down the law clearly that an accused in a State court has the right to an attorney and to a warning of the right against self-incrimination and that these rights were protected by the Fifth, Sixth and Fourteenth Amendments to the U. S. Constitution. These constitutional rights were and are to be applied in State as well as Federal courts. The Powell decision definitely holds that the due process clause of the Fourteenth Amendment incorporates the Fifth and Sixth Amendments and that case specifically required the same rule against self-incrimination as had existed in the Federal courts since Bram v. United States, 168 U.S. 532, 18 S.Ct. 183, 42 L.Ed. 568, which was to be more specifically set forth in McNabb v. United States, 318 U.S. 332, 63 S.Ct. 608, 87 L.Ed. 819 (1942); Brown v. Mississippi, 297 U.S. 278, 56 S.Ct. 461, 80 L.Ed. 682; Lisenba v. California, 314 U.S. 219, 62 S.Ct. 280, 86 L.Ed. 166; White v. Maryland, 373 U.S. 59, 83 S.Ct. 1050, 10 L.Ed. 2d 193 and numerous other cases. However, there were judges in State courts who continued to ignore the totality of circumstances in determining the volun-

tariness of confessions. It, therefore, became necessary for the Supreme Court to set guidelines to protect individual rights. The high court tightened up its guidelines and excluded peremptorily all evidence obtained without adequate warning to the accused of his right against self-incrimination and right to counsel in such cases as *Escobedo* and *Miranda,* supra.

 Petitioner was deprived of counsel for more than two weeks after his arrest and confession, his confession was coerced and his rights to due process of law under the Fifth, Sixth and Fourteen Amendments to the United States Constitution were violated.

(c) Petitioner alleges that the prosecution's withholding from the defense and jury the information that the confession was obtained by the use of drugs was a denial of petitioner's right to due process of law under the Fifth and Fourteenth Amendments, as held by the Supreme Court in Miller v. Pate, 386 U.S. 1, 87 S.Ct. 785, 17 L.Ed.2d 690 (1967).

 The issue here is not so much whether the petitioner was given medication but what the effect of that medication was and whether information as to its effect and common name were withheld. The confession was drug induced and involuntary. The record hereinbefore set forth is so clear that the confession was obtained from petitioner by use of drugs and their effect upon him under the circumstances that no further comment is necessary, except to find that petitioner's confession to the murder of Jack Boone was constitutionally inadmissible, should be suppressed, his death sentence vacated and a new trial ordered.

Even if the confession of petitioner were found not to have been drug induced, it should still be set aside because the totality of the circumstances existing at the time it was obtained would require that it be set aside as not a voluntary confession. In addition to the admitted administration of hyoscine and phenobarbital, physical and psychological coercion were involved. There is believeable evidence of physical coercion. There is overwhelming evidence of psychological coercion.

The facts are similar to those in the *McNabb* and *Powell* cases, supra, except that in the Townsend case the psychological coercion was twice compounded, once with a drug addict suffering from severe narcotic withdrawal symptoms and again with the administration of a drug that would overpower a normal mind.

To very briefly summarize the facts as hereinbefore set forth: Petitioner came from a broken home. As a boy he had a history of truancy from school and of delinquency. He was retarded. He became a narcotic addict at 15 and was a confirmed addict upon his arrest at the age of 19. About an hour and a half before his arrest in the early hours of January 1, 1954, he had a "jolt" of hereoin. Upon his arrest he was questioned and accused of murdering Boone. He denied this. He was thereafter held incommunicado and was not at any time warned of his right to remain silent or to have counsel. By about 8 o'clock in the evening he was suffering severe pain and distress from narcotic withdrawal symptoms. He was again questioned. There is evidence he was physically abused. He was promised treatment and relief if he would cooperate. A doctor was called and he was given an injection of what is familiarly called "the truth serum." His mind was overborne. He was questioned again and finally he confessed to four murders and two assaults and robberies in about an hour's time. The next day he signed five of these confessions as read to him as he could not read and only since has learned to read. He was deprived of counsel for two weeks after his arrest.

If there ever can be a confession obtained that is involuntary and coerced under the totality of the circumstances, this is such a case. Jackson v. Denno, Warden, 378 U.S. 368, 84 S.Ct. 1774, 12 L.Ed.2d 908 (1964); Beecher v. Alabama, 389 U.S. 35, 88 S.Ct. 189, 19 L.Ed. 2d 35 (1967); Clewis v. Texas, 386 U.S.

707, 87 S.Ct. 1338, 18 L.Ed.2d 423 (1967).

As to the six confessions taken from Townsend, one was not transcribed, as Townsend was not lucid enough to answer questions about the murder of Willis Thompson. One was at least questionable by Gus Anagnost picking another man as his assailant out of the "show up." As to a third, Thomas Johnson told his sister his injuries were the result of an accident. Townsend was acquitted at his trial for the murder of Johnny Stinson.

Furthermore, there was withheld from petitioner, his counsel, the trial judge and the jury information that hyoscine and/or scopolamine was colloquially known as "the truth serum" and information was not developed about the importance of environmental factors on the effect of the drug on petitioner so as to overpower his mind. Petitioner did not have this information at the trial. Petitioner's counsel did not have all this information at the trial. Petitioner's counsel was later to have some of this information and sought a new trial, urging the existence of new evidence, but his motion for a new trial was denied.

There is no question that this information was withheld by Dr. Mansfield. The prosecution knew or should have known this information but withheld it from petitioner. The Court believes Miller v. Pate, supra, is applicable here. As the Supreme Court said in *Miller*, "More than 30 years ago this Court held that the Fourteenth Amendment cannot tolerate a state criminal conviction obtained by the knowing use of false evidence. Mooney v. Holohan, 294 U.S. 103, 55 S.Ct. 340, 79 L.Ed. 791. There has been no deviation from that established principle. * * * "

This Court having found that petitioner's confession was involuntary, a new trial, at which the confession is excluded, is required. Jackson v. Denno, supra.

Jack Boone was a steelworker on his way home to his wife and two children one evening in December 1963. He was assaulted and robbed and died of his injuries. Charles Townsend was tried for Boone's murder and convicted. The question of Townsend's guilt or innocence is a matter to be tried in the State court and cannot be tried here. This Court can and has passed upon whether the confession Charles Townsend gave was drug induced and, therefore, involuntary; and this Court can and has decided that certain of his constitutional rights have been violated. It appears to this Court that there was no substantial evidence admitted or offered at petitioner's trial connecting him with the crime other than his confession and the testimony of Campbell. Townsend in his confession gave information which led to the finding of the wallet, where he said he threw it, but use of such evidence contravenes the long established doctrine against using fruit of the poisonous tree. Silverthorne Lumber Co. v. United States, 251 U.S. 385, 40 S.Ct. 182, 64 L.Ed. 319; Harrison v. United States 392 U.S. 219, 88 S.Ct. 2008, 20 L.Ed.2d 1047. As to Campbell, he was on probation growing out of a robbery conviction. He was first taken into custody as a suspect in the murder of Boone. He informed on Townsend to obtain his release. And as Justice Schaefer said in his dissenting opinion, supra, Campbell's testimony was "inherently incredible." Petitioner is entitled to a speedy resolution of the charges against him.

(d) In the Amended Petition filed by petitioner's attorneys it was alleged petitioner has "deteriorated into a state of insanity" as a result of the State's refusal to afford him a hearing and his confinement. The Court appointed a psychiatrist to examine petitioner, this Court has found Townsend sane, as aforesaid, and therefore this allegation of insanity is without factual support.

(e), (f) and (g) Petitioner alleges in his Amended Petition that he has been hindered in pursuing his judicial remedies because of the lack of a full and complete transcript of the proceed-

ings at his trial, particularly a verbatim report of the voir dire examination of veniremen. Petitioner was and is indigent and the State was obligated to furnish a transcript sufficient to enable him to avail himself of all judicial remedies to protect his constitutional and legal rights. Griffin v. Illinois, 351 U.S. 12, 76 S.Ct. 585, 100 L.Ed. 891 (1956); Long v. District Court of Iowa, 385 U.S. 192, 87 S.Ct. 362, 17 L.Ed.2d 290 (1966). The transcript provided to Townsend by the State did not contain a verbatim report of the voir dire examination of veniremen at petitioner's trial. The State, of course, cannot provide what it does not have. However, a partial record of the voir dire examination was available to the State at the trial and was obtained by persistent efforts on behalf of indigent petitioner by petitioner's attorneys just prior to this hearing. From said partial record it is clear that the State did challenge a number of prospective jurors for cause on the authority of Ill.Rev. Stats.1953, Ch. 38, Section 743, and those challenges were sustained by the Court. This partial transcript covers a part of the selection of the last panel of four jurors. It appears therein from a colloquy between the judge and counsel that in the selection of prior jurors there had been arguments by counsel over the challenging of the jurors and that the judge said, "From now on let the court reporter take the rest of the examination." Because of lack of a full transcript of the voir dire examination this Court cannot pinpoint the number of veniremen excused because they were in one way or another opposed to the death penalty. The partial transcript shows at least two excused on such grounds and the inference therein is that there were a number more excused on that ground prior to the selection of the last few jurors. This Court concludes that without a transcript of said examination petitioner was hindered in pursuing his remedies.

Because of preconceived views and opinions certain jurors could not fairly and impartially consider and evaluate the evidence and instructions given the jury. The jury was not a jury chosen from a cross-section of the community. Juries which are chosen by excluding persons who have general objections to the death penalty, or have conscientious or religious scruples against its imposition, leaves a jury composed of persons more prone to convict and impose a death sentence than a jury composed of a full section of veniremen called.

As the Supreme Court said in Witherspoon v. Illinois, 391 U.S. 510, 523, 88 S.Ct. 1770, 1778, 20 L.Ed.2d 776 (1968):

"Whatever else might be said of capital punishment, it is at least clear that its imposition by a hanging jury cannot be squared with the Constitution. The State of Illinois has stacked the deck against petitioner. To execute this death sentence would deprive him of his life without due process of law."

It is applicable in the case of Townsend.

Near the close of this hearing, petitioner sought to amend his Amended Petition and leave was given to add the following paragraph, to which respondent was given leave to file a response:

"(h) At all times material herein, a number of states in the United States did not authorize imposition of the death sentence on persons convicted of the crime of murder as did and does the State of Illinois. Only recently the Attorney General of the State of Pennsylvania, one of the states which does authorize that sentence, expressed the opinion that the death sentence was a cruel and unusual punishment in light of the Constitution and laws of the United States and ordered the destruction of the electric chair in that state on the ground that it was an obscenity. Petitioner is a citizen of the United States as well as of the State of Illinois. Accordingly, petitioner is entitled to the equal protection of the law of the United States. To subject petitioner to the death penalty when other citizens of the United States and of the State of Illinois, con-

victed of the same crime, are not so subject is denial to the petitioner of the equal protection of the laws of the United States and State of Illinois in violation of the Fifth and Fourteenth Amendments to the Constitution of the United States."

The Court takes judicial notice of the facts and law as alleged by petitioner. The Court finds that such different punishments upon different individuals found guilty of the same offense does not afford equal protection of the laws upon citizens of the United States and does not afford the petitioner herein equal protection under rights guaranteed to him by the Fifth Amendment as incorporated under the Fourteenth Amendment, and that, therefore, the imposition of the death sentence upon petitioner in the case at bar was and is unconstitutional. This being a case of first impression and there being no precedent contrary thereto this Court so holds.

The Court concludes petitioner has been denied in various respects due process of law and deprived of rights secured to him by the Fifth, Sixth and Fourteenth Amendments to the Constitution of the United States.

For all of the reasons heretofore assigned, the Court concludes Charles Townsend's confession to the murder of Jack Boone must be suppressed and that the jury verdict imposing the death penalty upon him and the sentence of death imposed upon him by the Criminal Court of Cook County, Illinois, must be declared void by this Court and set aside. It would be contrary to all moral, constitutional and jurisprudential principles to let the verdict of guilty imposed by said jury stand.

The Court concludes Charles Townsend is entitled to a new trial in said court, without the introduction of his said confession, or any reference to the finding of a wallet at the place designated in petitioner's confession since that is a product of the confession and not admisssible under the fruit of the poisonous tree doctrine.

Furthermore, from the other evidence adduced at the trial, unless the prosecution has new evidence, this Court is of the opinion there remains insufficient evidence to support a verdict of guilty beyond a reasonable doubt and, therefore, little likelihood that the petitioner will ever be found guilty. Inasmuch as petitioner has now been imprisoned for 17 years, it is only just and fair that he be granted bail pending trial or appeal, if the order of this Court is appealed. Furthermore, since the petitioner is indigent and cannot provide funds for a bond, under all the circumstances herein, he should be granted bail upon his own recognizance bond and such bond in the amount of $10,000 would be fair and reasonable.

Accordingly, a writ will issue and this Court is this day entering simultaneously herewith an order suppressing the confession of petitioner Charles Townsend together with all evidence that may be a product thereof, and it is declaring null and void the jury verdict and sentence of death imposed on petitioner in the Criminal Court of Cook County, Illinois. Said order will further remand petitioner to the custody of the Sheriff of Cook County, Illinois, to be held for a new trial pursuant to the law of the State of Illinois.

### JUDGMENT ORDER

This cause came on for hearing on the Amended Petition for Writ of Habeas Corpus of Charles Townsend, the Answer and Amended Answer thereto of respondents and a traverse by relator. The court has held an evidentiary hearing and heard the argument of counsel. It is this day entering simultaneously herewith a Memorandum Opinion in which it finds and concludes that the conviction and death sentence imposed upon petitioner herein by the Criminal Court of Cook County in the April Term, 1955 are unconstitutional and void in that the rights secured to petitioner by the Fifth, Sixth and Fourteenth Amendments to the Constitution of the United States were violated in the proceedings

had therein which resulted in said conviction and death sentence. In accordance with said Memorandum Opinion.

It is ordered, adjudged and decreed that:

1. Charles Townsend's confession to the murder of Jack Boone be and it hereby is suppressed together with all evidence that may be a product thereof.

2. The jury verdict imposing the death penalty upon Charles Townsend be and it hereby is declared void and set aside.

3. The death sentence imposed on Charles Townsend be and it hereby is declared void and set aside.

4. The Writ of Habeas Corpus applied for herein issue.

5. The mittimus whereby respondent John J. Twomey, Warden of Illinois Penitentiary, Joliet-Stateville Branch, incarcerates, holds and detains petitioner is void because it is based upon an unconstitutional conviction and death sentence.

6. Said Warden release petitioner from custody insofar as petitioner is held by virtue of the mittimus that issued from the conviction and death sentence of the Criminal Court of Cook County entered April 7, 1955.

7. Said Warden turn over petitioner to the Sheriff of Cook County, Illinois to be held pursuant to the mittimus that issued from the Grand Jury of Cook County when it returned the indictment in People of the State of Illinois vs. Charles Townsend, No. 54–11, which indictment was returned January 6, 1954.

8. The Sheriff of Cook County, Illinois hold petitioner pursuant to said Grand Jury mittimus for a new trial to be held in the Criminal Court of Cook County within four (4) months from date of this order.

9. Authorities of the State of Illinois retry petitioner on the charge of murder of Jack Boone within four (4) months from date of this order in accordance with Illinois law.

This court is retaining jurisdiction of this cause to enter such final order for the release of petitioner from the custody of respondent Warden or the Sheriff of Cook County as it deems proper in the event the authorities of the State of Illinois fail to bring petitioner to trial within four (4) months of the date of this order.